### UNITED STATES v. DELAWARE, L. & W. R. CO. et al.

(District Court, D. New Jersey. April 7, 1914.)

No. 297.

1. CARRIERS (§ 25*) — REGULATION OF INTERSTATE RAILROADS — COMMODITIES CLAUSE OF INTERSTATE COMMERCE ACT—SEPARATE CORPORATION.

Under the decisions of the Supreme Court construing the commodities clause of Hepburn Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1287), and holding that it does not prohibit a railroad company from transporting in interstate commerce commodities manufactured, mined, produced, or owned at the time of shipment by a distinct bona fide corporation, merely because of the company's ownership of stock in such corporation, irrespective of the extent of such stock ownership, a railroad company, owning and holding as lessee, at the time of the passage of the act, a large quantity of coal lands and extensive mines and storage and sales equipment throughout the country, which after such decisions, in good faith, organized a separate coal company to lease its outside equipment and buy the product of its mines at the breakers, in which corporation it owns no stock, but sold the greater part to its own stockholders, by whom much of it was afterwards sold to third persons, is not prohibited from carrying the coal from its mines after it has passed into the ownership of the coal company.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 25.*]

2. CARRIERS (§ 25*)—REGULATION OF INTERSTATE RAILROADS—COMMODITIES CLAUSE OF INTERSTATE COMMERCE ACT—CARRIAGE OF PROPERTY OWNED BY SEPARATE CORPORATION.

It is insufficient to render such transportation unlawful that a comparatively small number of persons own a controlling interest in both the railroad company and the coal company, and that some of the officers and directors of the two are the same, where the business of each is separately conducted, and no discrimination is shown to have been made by the railroad company in favor of the coal company as a shipper.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 25.*]

3. CARRIERS (§ 25*)—REGULATION OF INTERSTATE RAILROADS—COMMODITIES CLAUSE OF INTERSTATE COMMERCE ACT—INTEREST IN COMMODITY CARRIED.

A contract between the two companies, by which the coal company agreed to buy f. o. b. at the mines all of the coal mined or purchased by the railroad company which it desired to sell, and to pay for certain grades thereof a stated per cent. of the general average f. o. b. prices of such coal at tidewater points, does not leave the railroad company with "any interest, direct or indirect," in the coal, after its delivery to the coal company, which renders its transportation unlawful under the statute, where all shipments are made pursuant to orders of the coal company, and the latter also has full control over the prices at which it sells.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 25.*]

In Equity. Suit by the United States against the Delaware, Lackawanna & Western Railroad Company and the Delaware, Lackawanna & Western Coal Company. On final hearing. Decree for defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

F. R. Coudert and H. T. Kingsbury, both of New York City, for plaintiff.

W. S. Jenney, of New York City, and J. G. Johnson, of Oneonta, N. Y., for defendants.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This proceeding is based chiefly upon the commodities clause (Act ·June 29, 1906, c. 3591, § 1, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1287]), which forbids any railroad company to carry in interstate commerce after May 1, 1908—

"* * * any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

The government's contention is that the Delaware, Lackawanna & Western Railroad Company is violating this statute because it is carrying in such commerce anthracite coal originally produced by its own mines in Pennsylvania or bought from other mineowners in that state, the government alleging that during such carriage the railroad continuously retains some kind or degree of interest or ownership in the coal. The railroad denies that any such interest or ownership exists, averring that the coal is sold in good faith before the carriage begins; the other defendant, the Delaware, Lackawanna & Western Coal Company, being the buyer under a contract that will be referred to hereafter. The government attacks this contract, declaring it to be merely a subterfuge, and to have no effect in divesting or modifying the railroad's title. The questions raised by the record are· of very great importance, and it is therefore a matter for much satisfaction that the Supreme Court has already considered the general subject,· and has laid down the rules by which the controversy must be decided. We think it desirable to preface the discussion by stating in sufficient outline (even at the risk of seeming diffuse) what has been said and done in two previous suits where the meaning and effect of the clause under consideration were directly involved.

In June, 1908, the defendant railroad and five other coal-carrying roads were brought into the Circuit Court for the Eastern District of Pennsylvania, charged with violating the statute. The companies appeared and defended, and the cases were argued upon the several bills or petitions and the answers thereto, no testimony having been taken. In September of that year the Circuit Court dismissed the proceedings, one of the judges dissenting. The majority opinion (164 Fed. 215 et seq.) was put upon the ground—we state it briefly and in general terms—that under the proper construction of the statute a railroad was forbidden to carry its own coal to market, and was thus deprived of its property in violation of the fifth amendment to the federal Constitution. The dissenting opinion rests upon the propositions that the power to regulate commerce includes the power to reg-

ulate the carrier, and that commerce might be lawfully regulated by ordaining that a public carrier should not also be a private shipper. The cases were then appealed to the Supreme Court, and were decided by that tribunal early in May, 1909. United States v. Delaware & Hudson Co., 213 U. S. 367, 29 Sup. Ct. 527, 53 L. Ed. 836 et seq. The opinion shows that the court did not pass upon the differing views of the Circuit Judges, and did not find it necessary to discuss the fifth amendment. But the government's contention concerning the scope and meaning of the clause was stated, and the far-reaching consequences of such contention were recognized. The present Chief Justice (who wrote the opinion of the court) declared (213 U. S. 406, 29 Sup. Ct. 535 [53 L. Ed. 836]) that:

"* * * If the contention of the government as to the meaning of the commodities clause be well founded, at least a majority of the court are of the opinion that we may not avoid determining the following grave constitutional questions: (1) Whether the power of Congress to regulate commerce embraces the authority to control or prohibit the mining, manufacturing, production, or ownership of an article or commodity, not because of some inherent quality of the commodity, but simply because it may become the subject of interstate commerce. (2) If the right to regulate commerce does not thus extend, can it be impliedly made to embrace subjects which it does not control, by forbidding a railroad company engaged in interstate commerce from carrying lawful articles or commodities, because, at some time prior to the transportation, it had manufactured, mined, produced, or owned them, etc.? And involved in the determination of the foregoing questions we shall necessarily be called upon to decide: (a) Did the adoption of the Constitution and the grant of power to Congress to regulate commerce have the effect of depriving the states of the authority to endow a carrier with the attribute of producing as well as transporting particular commodities, a power which the states from the beginning have freely exercised, and by the exertion of which governmental power the resources of the several states have been developed, their enterprises fostered, and vast investments of capital have been made possible? (b) Although the government of the United States, both within its spheres of national and local legislative power, has in the past for public purposes, either expressly or impliedly, authorized the manufacture, mining, production, and carriage of commodities by one and the same railway corporation, was the exertion of such power beyond the scope of the authority of Congress, or, what is equivalent thereto, was its exercise but a mere license, subject at any time to be revoked and completely destroyed by means of a regulation of commerce?"

Upon these serious questions, however, the court intimated no opinion, because an analysis of the clause and the ascertainment of its true meaning thereby rendered such an opinion unnecessary. Without following the analysis, it is enough to say that the court did not approve either of the constructions maintained in the opinions of the Circuit Court, but reached its own conclusions on this subject, stating the true meaning of the statute to be as follows (213 U. S. 415, 29 Sup. Ct. 538 [53 L. Ed. 836]):

"We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions:

"(a) When the article or commodity has been manufactured, mined, or produced by a carrier or under its authority, and at the time of transportation the carrier has not in good faith before the act of transportation dissociated itself from such article or commodity; (b) when the carrier owns the article or commodity to be transported in whole or in part; (c) when the carrier at the time of transportation has an interest, direct or indirect, in a legal or

equitable sense, in the article or commodity, not including, therefore, articles or commodities manufactured, mined, produced, or owned, etc., by a bona fide corporation in which the railroad company is a stockholder."

In the Circuit Court no testimony had been taken, but the controversy had been heard upon the pleadings, and mainly for this reason the Supreme Court did not give particular directions concerning each defendant, but remanded with general instructions that such further proceedings be taken as should be necessary to apply and enforce the statute interpreted as just set forth.

After the cases had been sent back for further proceedings, the government in March, 1910, asked leave to amend its charge against the Lehigh Valley Railroad Company, one of the six roads originally attacked. This amendment was afterwards summarized by the Supreme Court in 220 U. S. at page 268, 31 Sup. Ct. at page 389 (55 L. Ed. 458), as follows:

"In substance it was averred that as to this particular coal company the railroad company was not only the owner of all the stock issued by the coal company, but that the railroad company so used the power thus resulting from its stock ownership as to deprive the coal company of all real independent existence, and to make it virtually but an agency or dependency or department of the railroad company. In other words, in great detail facts were averred which tended to establish that there was no distinction in practice between the coal company and the railroad company, the latter using the coal company as a mere device to enable the railroad company to violate the provisions of the commodities clause. It was expressly charged that in consequence of these facts:

" 'The coal company is not a bona fide mining company, but is merely an adjunct or instrumentality of the defendant. The defendant is in legal effect the owner of and has a pecuniary interest in the coal mined by the coal company, and which is transported by the defendant.'

"Not only was it thus charged that the railroad company used its stock ownership to so commingle the operations of the affairs of the mining company with its own as to render it impossible to distinguish as a matter of fact between them, but it was moreover expressly in substance charged that, exerting its influence as the owner of all the stock of the coal company, the railroad company caused the coal company to buy up all the coal produced by other mining companies in the area tributary to the railroad, and fixed the price at which such coal was bought, so as to control the same and the transportation thereof, and establish the price at which the coal thus ostensibly acquired by the coal company by purchase should be sold when it reached the seaboard.

"It was charged that by these abuses the production, shipment, and sale of all the coal within the territory served by the railroad company was brought within the dominion of that company practically to the same extent as if it was the absolute owner of the same. Finally it was alleged as follows:

" 'That by virtue of the facts hereinbefore set out and otherwise, and more particularly by virtue of the control, direction, domination, and supervision exercised by the persons who are the officers of the defendant railroad and by the defendant over all the operations of the said coal company, embracing the mining and production of said coal, the shipment and transportation of the same over the defendant railroad, and the sale thereof at the seaboard, it follows:

" 'First. That the coal company, not being in substance and in good faith a bona fide corporation, separate from the defendant, but a mere adjunct or instrumentality of the defendant, the defendant, at the time of transportation, has an interest, direct or indirect, in a legal or equitable sense, in said coal.

" 'Second. That said coal of said coal company is mined and produced under the authority of defendant, and the defendant at the time of transportation and before the act of transportation has not in good faith dissociated.

itself from all exercise of authority over said coal, but continues to exercise authority over said coal at the time of transportation and over the subsequent sale thereof.'"

The Circuit Court refused permission to make this amendment—the refusal apparently resting upon the ground that the amendment added nothing essentially new to the original cause of action—and again entered a final decree against the government. Thereupon another appeal was taken to the Supreme Court, and the court held (United States v. Lehigh Valley Co., 220 U. S. 257, 31 Sup. Ct. 387, 55 L. Ed. 458 et seq.) that the amendment should have been allowed, declaring that the additions thereby proposed to the original bill were not foreclosed by the decision in the Delaware & Hudson Company's Case. After summarizing the amendment in the words quoted above, the Chief Justice went on to say (220 U. S. 271, 31 Sup. Ct. 390 [55 L. Ed. 458]):

"While that decision expressly held that stock ownership by a railroad company in a bona fide corporation, irrespective of the extent of such ownership, did not preclude a railroad company from transporting the commodities manufactured, mined, produced, or owned by such corporation, nothing in that conclusion foreclosed the right of the government to question the power of a railroad company to transport in interstate commerce a commodity manufactured, mined, owned, or produced by a corporation in which the railroad held stock and where the power of the railroad company as a stockholder was used to obliterate all distinctions between the two corporations; that is to say, where the power was exerted in such a manner as to so commingle the affairs of both as by necessary effect to make such affairs practically indistinguishable and therefore to cause both corporations to be one for all purposes. To what extent the amendment charged this to be the case will become manifest by again particularly considering its averments concerning the use by the railroad company of the coal company as a purchaser of coal, as also the direct charge made in the proposed amendment that by such acts the railroad company was enabled to control all or a greater portion of the coal produced in the region tributary to its road, and thus to dominate the situation and fix the price, not only at which all the coal could be bought, but at which it could be sold at the seaboard for consumption.

"That the facts thus averred and the other allegations contained in the proposed amended bill tended to show an actual control by the railroad company over the property of the coal company, and an actual interest in such property beyond the mere interest which the railroad company would have had as a holder of stock in the coal comany, is we think clear. The alleged facts, therefore, brought the railroad company, so far as its right to carry the product of the coal company is concerned, within the general prohibitions of the commodities clause, unless for some reason the right of the railroad company to carry such product was not within the operation of that clause. The argument is that the railroad company was so excepted, because any control which it exerted or interest which it had in the product of the coal company resulted from its ownership of stock in that company, and would not have existed without such ownership. The error, however, lies in disregarding the fact that the allegations of the amended bill asserted the existence of a control by the railroad company over the coal corporation and its product, rendered possible, it is true, by the ownership of stock, but which was not the necessary result of a bona fide exercise of such ownership, and which could only have arisen through the use by the railroad of its stock ownership for the purpose of giving it, the railroad company, as a corporation for its own corporate purposes, complete power over the affairs of the coal company, just as if the coal company were a mere department of the railroad. Indeed, such a situation could not have existed, had the fact that the two corporations were separate and distinct legal entities been regarded in the administration of the affairs of the coal company. Granting this to be the case, however, it is in

effect urged, as the railroad company held all the stock in the coal company, and therefore any gain made or loss suffered by that company would be sustained by the railroad company, no harm resulted from commingling the affairs of the two corporations and disregarding the fact that they were separate juridical beings, because ultimately considered they were but one and the same. This, however, in substance but amounts to asserting that the direct prohibitions of the commodities clause ought to have been applied to a case of stock ownership particularly to a case where the ownership embraced all the stock of a producing company, and therefore that a mistake was committed by Congress in not including such stock ownership within the prohibitions of the commodities clause. We fail, however, to appreciate the relevancy of the contention. Our duty is to enforce the statute, and not to exclude from its prohibitions things which are properly embraced within them. Coming to discharge this duty, it follows, in view of the express prohibitions of the commodities clause, it must be held that, while the right of a railroad company as a stockholder to use its stock ownership for the purpose of a bona fide separate administration of the affairs of a corporation in which it has a stock interest may not be denied. the use of such stock ownership in substance for the purpose of destroying the entity of a producing, etc., corporation, and of commingling its affairs in administration with the affairs of the railroad company, so as to make the two corporations virtually one, brings the railroad company so voluntarily acting as to such producing, etc., corporation within the prohibitions of the commodities clause. In other words, that by operation and effect of the commodities clause there is a duty cast upon a railroad company proposing to carry in interstate commerce the product of a producing, etc., corporation in which it has a stock interest not to abuse such power so as virtually to do by indirection that which the commodities clause prohibits, a duty which plainly would be violated by the unnecessary commingling of the affairs of the producing company with its own, so as to cause them to be one and inseparable."

It will be observed that (for the purpose of deciding whether the government's motion should have been allowed) the Supreme Court necessarily assumed that the averments of the proposed amendment were true, and while a summary of these averments has already been given it may therefore be useful to give the full text in the margin.[1]

[1] "The defendant [the Lehigh Valley Railroad Company] continuously for several years last past has been and now is the owner of the entire capital stock of the Lehigh Valley Coal Company, hereinafter called the 'Coal Company,' a corporation of the state of Pennsylvania, which holds by conveyances and leases anthracite coal lands and coal mines situated in the counties of Carbon, Lehigh, Luzerne and Wyoming, in the state of Pennsylvania, which mines have been and are being operated in the mining of coal, and are tributary to the lines of transportation operated by the defendant, and the coal so mined has been and is being carried by the defendant over its said lines of transportation. There have been and are a large number of other companies and individuals situated in the same localities and engaged in the mining of such anthracite coal and in shipping the same over the lines of transportation owned by the defendant to markets in other states in competition with each other and the Coal Company.

"The Coal Company is so organized and controlled by the defendant and its affairs are so conducted as to make it merely an instrumentality or adjunct of the defendant. That the Coal Company is a mere adjunct, instrumentality or department of the defendant appears from the following facts, among others:

"For a long time past the defendant has owned and now owns the entire capital stock of the Coal Company.

"For a long time past the officers of the defendant have been and are now the principal officers of the Coal Company. They are appointed officers of the Coal Company through the influence of the defendant, and for the reason that they are, respectively, officers of the defendant; as officers of the Coal

We repeat that the language just quoted from the opinion in the Lehigh Valley Case was used upon the assumption that the averments of the proposed amendment were true, and it is these therefore that were held to describe a relation, and particularly to describe a course of conduct or a series of acts, that "obliterated all distinction between the two corporations," and that so commingled their affairs "as by necessary effect to make these affairs practically indistinguishable, and thus to cause both corporations to be one for all purposes." It was held that, although a railroad company may carry in interstate com-

Company they are acting merely on behalf of and for the defendant, and under the direction and instructions of the latter.

"Specifying the officers more particularly:

"The president of the defendant, E. B. Thomas, is president of the Coal Company; the first vice president of the defendant, J. A. Middleton, is second vice president of the Coal Company; the assistant to the president of the defendant, L. D. Smith, is assistant to the president of the Coal Company; the secretary of the defendant, D. J. Baird, is secretary of the Coal Company; the treasurer of the defendant, W. C. Alderson, is treasurer of the Coal Company; the assistant treasurer of the defendant, J. M. Baxter, is assistant treasurer of the Coal Company; the assistant secretary of the defendant, E. A. Albright, is assistant secretary of the Coal Company; the assistant treasurer of the defendant, J. William Robbins, is assistant secretary of the Coal Company.

"Of the six directors of the Coal Company, the following, to wit, George F. Baker and E. T. Stotesbury, are directors of the defendant, and J. A. Middleton and L. D. Smith are, respectively, first vice president and assistant to the president of defendant.

"E. B. Thomas, E. T. Stotesbury, and George F. Baker, who are on the executive committee of the Coal Company, are also on the executive committee of the defendant.

"The defendant, by reason of the fact that it owns the entire capital stock of the Coal Company, is enabled to and does dictate who shall be elected directors of the Coal Company, who shall be its officers and employés and who shall be on the various committees.

"Each of the above-named officers, directors, and committee men, and others not specified, is appointed to his position in the Coal Company by reason of his holding a position with the defendant, thereby enabling him in all matters to act in the interests and on behalf of the defendant, and in the position in the Coal Company to which he has been appointed he acts in reality for and on behalf of the defendant and under the directions of the latter.

"The Coal Company uses the offices of the defendant, and the work of the Coal Company is carried on over the desks belonging to the defendant. The Coal Company in fact is nothing more than a department of the defendant, being operated by officers who in their principal capacity are officers of the defendant, and by virtue of their position in the defendant control and dominate the actions of the Coal Company.

"The defendant, through its officers and directors, exercises a supervision over the coal mined by the Coal Company from the time of the mining of said coal to the sale of the same at New York and other markets. The defendant, through its officers and directors, determines how much coal the Coal Company shall mine, it dictates the shipment and transportation of said coal over its own lines, and it fixes, regulates, and determines the price at which the Coal Company shall sell the coal at the Atlantic seaboard and other places to which it has been transported over the lines of the defendant or at the dictation of the defendant.

"Acting under the direction and instructions of the defendant, and of its officers and directors, the Coal Company has entered and is entering into contracts with other companies and individuals, producers and miners of coal, and tributary to the lines of transportation owned by defendant and to other railroads, for the purchase of the coal mined by said companies and in-

merce the product of a manufacturing, mining, producing, or owning corporation in which the railroad has a stock interest, the power given by such interest must not be abused; for the duty that rests upon the railroad not to abuse such power, "so as virtually to do by indirection that which the commodities clause prohibits, * * * plainly would be violated by the unnecessary commingling of the affairs of the producing company with its own so as to cause them to be one and inseparable."

dividuals. The defendant causes this coal to be shipped and transported over its own lines, and, acting through the Coal Company, it fixes and determines the prices at which such coal shall be sold after transportation to the Atlantic seaboard and other markets. The Coal Company as a rule loses money on these transactions, as the amounts received by it for the coal which it has bought from such companies and individuals generally do not equal the price paid by it for the coal plus the cost of transportation to market. The purpose of the defendant in compelling the Coal Company to enter into such contracts with other coal companies and individuals is thereby to remove the competition which would otherwise exist between the coal mined and sold by such companies and the coal controlled by the defendant through the Coal Company, and furthermore to enable the defendant by means of these contracts to dictate the transportation of such coal over its own lines, and to obtain the freight charged therefor.

"The Coal Company has not paid any dividends upon its stock during the time such stock has been owned by the defendant. It has been furnished millions of dollars by the defendant, which it has never refunded, and upon which during many years it paid no interest. The defendant has guaranteed bonds of the Coal Company, and paid interest on such bonds. The earnings of the defendant received for the transportation over its lines of the coal produced by the Coal Company and of the coal controlled by means of the contracts above described compensates the defendant for the failure of the Coal Company to pay dividends on its stock.

"The operation of the Coal Company by the defendant in effect merely is a device for evading the law, and more particularly the provisions of the said commodities clause. The Coal Company is not a bona fide mining company, but is merely an adjunct or instrumentality of the defendant. The defendant is in legal effect the owner of and has a pecuniary interest in the coal mined by the Coal Company, and which is transported by the defendant.

"That by virtue of the facts hereinbefore set out and otherwise, and more particularly by virtue of the control, direction, domination, and supervision exercised by the persons who are the officers of the defendant railroad and by the defendant over all the operations of said Coal Company, embracing the mining and production of said coal, the shipment and transportation of the same over the defendant railroad, and the sale thereof at the seaboard, it follows:

"First. That the Coal Company, not being in substance and in good faith a bona fide corporation, separate from the defendant, but a mere adjunct or instrumentality of the defendant, the defendant, at the time of transportation, has an interest, direct or indirect, in a legal or equitable sense, in said coal.

"Second. That said coal of said Coal Company is mined and produced under the authority of defendant, and the defendant at the time of transportation and before the act of transportation has not in good faith dissociated itself from all exercise of authority over said coal, but continues to exercise authority over said coal at the time of transportation and over the subsequent sale thereof.

"Therefore the transportation of said coal by the defendant in the manner and under the circumstances hereinabove described constitutes a violation of the fifth paragraph of the first section of said 'act to regulate commerce,' as amended by an act of Congress approved June 29, 1906."

The opinion in the Lehigh Valley Case was delivered in April, 1911, and the Reports of the Attorney General for 1911 and 1912 contain references to the subject. In the Report for 1911 the two decisions of the Supreme Court are thus referred to:

"As stated in my last annual report, after the decision in the original commodities clause case (U. S. v. Delaware & Hudson Company, 213 U. S. 366 [29 Sup. Ct. 527, 53 L. Ed. 836])—in which the Supreme Court, while sustaining the validity of that provision in the Hepburn Act of 1906 (34 Stat. 584) which prohibits the transportation in interstate commerce by a carrier of a commodity produced or owned by it, etc., except such as may be necessary in the conduct of its business, held, however, that a carrier was not the owner of an interest in articles manufactured, mined, produced, or owned by a corporation whose stock was owned by it, within the meaning of the statute—the government applied to the Circuit Court for leave to file an amended bill, which was denied, whereupon an appeal was taken to the Supreme Court from that decision. In substance, the government by its proposed amendment averred that, in the particular case at bar, the railroad company was not only the owner of all the stock issued by a coal company, but that it so used the power resulting from this stock ownership as to deprive the coal company of all real independent existence, and to make it virtually but an agency, or dependency, or department, of the railroad company. In other words, to employ the language of the court:

"'In great detail facts were averred which tended to establish that there was no distinction in practice between the coal company and the railroad company, the latter using the coal company as a mere device to enable the railroad company to violate the provisions of the commodities clause.'

"The Supreme Court, on this showing, reversed the order of the Circuit Court and remanded the case, with instructions to permit the amendment to be filed, because the facts, if proven, would bring the railroad company, so far as its right to carry the product of the coal company was concerned, within the general prohibitions of the commodities clause. Accordingly, the government is proceeding in the Circuit Court, endeavoring to apply the prohibitions of the commodities clause to the carriage by a railroad company over its line of coal mined and owned by a coal company every share of the stock of which is owned by the railroad company, and which is operated as a department of the railroad company."

And in the Report for 1912 the following statement will be found on pages 23 and 24:

"Following the decision in the case of United States v. Lehigh Valley Railroad Company, referred to in my last annual report (220 U. S. 257 [31 Sup. Ct. 387, 55 L. Ed. 458]), remanding the case to the Circuit Court with instructions to allow the government to amend its complaint in order to show that the Lehigh Valley Coal Company was in fact a mere adjunct, instrumentality or department of the railroad company, and, therefore, that ownership of the coal by the coal company at the time of transportation amounted in reality to ownership by the railroad company, and was transported in violation of the commodities clause of the commerce act (34 Stat. 584), the railroad company filed an answer to the amended complaint putting its allegation in issue. Subsequently, however, the railroad company caused to be incorporated under the laws of New Jersey a separate company known as the Lehigh Valley Coal Sales Company, with an authorized capital stock of $10,000,000, of which $6,-060.800 was issued forthwith. The Lehigh Valley Railroad Company declared a dividend in January, 1912, of 10 per cent. on its outstanding capital stock. This dividend amounted in the aggregate to $6,060,800. The preferred and common stockholders of the railroad company were given the privilege of subscribing to shares of the sales company to an amount equivalent to 10 per cent. of their holdings. By this method, in effect, the shares of the sales company were distributed to and among the shareholders of the railroad company. Thereupon, on March 1, 1912, the Lehigh Valley Coal Company entered into a contract with the Lehigh Coal Sales Company whereby the for-

mer agreed to sell to the latter all coal thereafter mined by it from all coal lands owned or leased by it, together with all coal it may purchase, the sales company agreeing to purchase and take all such coal at a price delivered f. o. b. railroad cars, at the breakers where the same is prepared, at, for all sizes above pea coal, a sum equal to 65 per cent. of the general average f. o. b. price of said sizes received at the water points at or near New York, between Perth Amboy and Edgewater.

"The situation is, therefore, that coal which is shipped over the Lehigh Valley Railroad is mined by the Lehigh Valley Coal Company, all of whose stock is owned by the railroad company, and is sold at the breakers to the Lehigh Valley Coal Sales Company, all of whose stock has been originally issued to and distributed among the stockholders of the railroad company pro rata, but which company has separate officers from the railroad company, and separate directors, and whose stock may be sold by the stockholders without regard to their continued holding of stock in the railroad company. By this arrangement both the railroad company and the coal companies seem to have parted in good faith with title to the coal before transportation begins, and it is claimed, therefore, that transportation is free from the prohibition of the commodities clause as construed by the Supreme Court in 213 U. S. 412 [29 Sup. Ct. 527, 53 L. Ed. 836]. The question will be submitted to the court at an early day."

[1] In the following month, on January 27, 1913, the amended bill in the Eastern district of Pennsylvania was dismissed with the government's consent, but without prejudice to the right to bring a new suit. We understand that such a suit has recently been brought in the Second circuit. The foregoing résumé states in sufficient detail the course of the previous litigation against the coal-carrying roads, and brings us to the present dispute. The rules to which we have referred are now to be applied to the relation existing, and to the course of conduct actually pursued, between the Delaware, Lackawanna & Western Railroad Company and the Delaware, Lackawanna & Western Coal Company, and we are to determine whether the facts establish that the power of the Railroad Company has been "used to obliterate all distinctions between the two corporations"; or (to employ other language of the court) whether the power of the Railroad Company has been "exerted in such a manner as to commingle the affairs of both as by necessary effect to make such affairs practically indistinguishable, and therefore to cause both corporations to be one for all purposes." If the railroad has the power to attain the objects thus condemned, and if these objects have been attained by the actual use and exertion of the power, the commodities clause has been violated; otherwise, it has not been infringed.

It will be a help in appreciating the evidence now under consideration if we first take some account of the general situation in the anthracite region of Pennsylvania. This is well described in a paragraph from page 224 of 164 Fed., afterwards quoted by the Supreme Court in the Delaware & Hudson Case, at page 402 of 213 U. S., at page 530 of 29 Sup. Ct. (53 L. Ed. 836):

"The general situation is that for a half century, or more, it has been the policy of the state of Pennsylvania, as evidenced by her legislative acts, to promote the development of her natural resources, especially as regards coal, by encouraging railroad companies and canal companies to invest their funds in coal lands, so that the product of her mines might be conveniently and profitably conveyed to markets in Pennsylvania and in other states. Two of the defendant corporations, as appears from their answers, were created by the Legislature of Pennsylvania, one of them three-quarters of a century ago and

the other half a century ago, for the express purpose that its coal lands might be developed and that coal might be transported to the people of Pennsylvania and other states. It is not questioned that, pursuant to this general policy, investments were made by all the defendant companies in coal lands and mines, and in the stock of coal-producing companies, and that coal production was enormously increased and its economies promoted, by the facilities of transportation thus brought about. As appears from the answers filed, the entire distribution of anthracite coal in and into the different states of the Union and Canada, for the year of 1905 (the last year for which there is authoritative statistics) was 61,410,201 tons; that approximately four-fifths of this entire production of anthracite coal was transported in interstate commerce over the defendant railroads, from Pennsylvania to markets in other states and Canada; and of this four-fifths, from 70 per cent. to 75 per cent. was produced either directly by the defendant companies or through the agency of their subsidiary coal companies. It also appears from the answers filed that enormous sums of money have been expended by these defendants, to enable them to mine and prepare their coal and to transport it to any point where there may be a market for it. It is not denied that the situation thus generally described is not a new one, created since the passage of the act in question, but has existed for a long period of years prior thereto, and that the rights and property interests acquired by the said defendants in the premises have been acquired in conformity to the Constitution and laws of the state of Pennsylvania, and that their right to the enjoyment of the same has never been doubted or questioned by the courts or people of that commonwealth, but has been fully recognized and protected by both."

In addition to these considerations, the following facts—also taken from the Delaware & Hudson Case, in 164 Fed. on page 221—were especially applicable then to the railroad company now defendant, and may be referred to again as relevant to a large extent in the present controversy:

"The Delaware, Lackawanna & Western Railroad Company, like the Delaware & Hudson Company, admits that it is the owner of coal lands, and mines coal which it sells; that it was organized under an act of the Legislature of Pennsylvania in 1849 (Act Feb. 19, 1849 [P. L. 79]); that all the lines of railroad owned by it are wholly within the state of Pennsylvania, extending from the Delaware river, at the boundary line of the state of New Jersey, in a northwesterly direction across the state of Pennsylvania, to the boundary line between the state of Pennsylvania and the state of New York, with a branch line extending from Scranton, in the state of Pennsylvania, to Northumberland, in said state. Said defendant also admits and alleges that, under express authority of acts of the Legislature of the states of Pennsylvania, New Jersey, and New York, it, as lessee, now operates, and long prior to May 1, 1908, had operated, various lines of railroad in the two last-mentioned states, by which it has direct traffic connection with the city of Buffalo and other cities in the said states. Defendant also admits that for many years it has owned, in fee, extensive tracts of coal land in the state of Pennsylvania; that it has also leased large tracts of coal lands in the said state, and is now engaged, and for many years last past has been engaged, in mining coal from the lands so owned and leased by it; that the holding of said lands, whether in fee or by lease, and the mining, manufacture, and interstate transportation of the coal therefrom, has been and continues to be under and by virtue of the authority of the laws of the state of Pennsylvania; that in addition to the foregoing, certain coal companies, organized from time to time under acts of assembly of the said state of Pennsylvania, have been merged into said defendant corporation; that by an act of the General Assembly of the state of Pennsylvania, approved April 15, 1869, entitled 'An act to authorize railroad and canal companies to aid in the development of the coal, iron, lumber, and other material interests of this commonwealth,' the defendant was authorized to aid corporations authorized by law to develop coal, iron, lumber, and other material interests of Pennsylvania, by purchase of their capital stock or bonds, or either of them. The answer of said defend-

ant also alleges that, by reason of its ownership of said coal lands and coal and the revenues derived from the transportation of the same to market, it has been enabled to expend millions in the betterment of its general transportation facilities for both goods and passengers, and give to the public the benefits of a well constructed and equipped modern railroad; that by virtue of leases of railroads, to enable it to transport coal in interstate commerce, it has become bound to pay yearly, in interest charges, the sum of $5,155,697, and for taxes $1,163,916; that out of a total of about 8,700,000 tons of coal produced by it in the year 1907 from its land owned in fee and leased, upwards of 6,700,000 tons were transported over its lines of railroad in interstate commerce; that from 40 per cent. to 60 per cent. of its annual transportation earnings, from the operation of leased lines, has been derived from the carriage of its own coal thereover; that it uses, in the conduct of its business as a common carrier, approximately 1,700,000 tons of anthracite coal of pea size or smaller, annually, and will require more for such use in the future; that to obtain this coal in these economic sizes, it is necessary to break up coal, leaving the larger sizes which must be disposed of otherwise; that great waste would result if it were forbidden to transport to market in interstate commerce these large sizes thus resulting. That defendant's rights to acquire its holdings of coal land, its rights to own and mine coal and to transport the same to market in other states, as well as in Pennsylvania, and its leases of other railroads, were acquired many years prior to the enactment of the so-called 'interstate commerce act,' and of the said amendment thereto known as the 'commodities clause.' "

Turning to the record now under consideration, we find no facts of importance in dispute; the controversy is over the inferences that should properly be drawn therefrom. The relation existing between the two defendants is a direct result of the railroad's effort to obey the decision of the Supreme Court in the first of the cases referred to —United States v. Delaware & Hudson Co. When that decision was announced on May 3, 1909, the Railroad Company was presented with a serious problem. It owned or leased 15,000 acres of coal lands in the Wyoming region, and these were of great value, both present and prospective. Its mines were producing several million tons of coal each year, and the sale and carriage of this coal were highly important sources of revenue, and its uninterrupted distribution through the established channels of trade was of great importance to the public. It had more than 600,000 tons of mined coal on hand, not yet disposed of, either on storage or in course of transit. A demand for the coal that the railroad had been selling for many years existed throughout a wide territory, stretching from New England into Canada and the Middle West; and an extended and elaborate organization had grown up in the course of a long and continuous effort to bring the coal to the consumer seasonably and economically. Facilities for storage and handling had gradually been acquired and expanded; numerous contracts had been made with agents and dealers; other contracts existed with independent operators for the purchase of additional coal for carriage and sale—all this, and much more, resting upon the undisturbed practice of many years under direct state authority, whereby the Railroad Company mined its own coal, bought coal from others, and carried and sold in many and in widely separated markets the property thus mined and bought.

This long-established business was now to be changed, and changed almost immediately. In our opinion the evidence shows that the railroad intended to obey the law as the Supreme Court had authorita-

tively announced it, and we may say at once that an examination of the record affords no ground to doubt the good faith of all concerned in the transactions now complained of. No trick or sham or evasion was contemplated or attempted, but a genuine effort was apparently made to comply with the statute and to carry out openly and publicly what the court had declared to be necessary. The situation was not welcome, but the railroad clearly understood it and accepted it frankly. No doubt existed that the railroad must dissociate itself in good faith from the ownership of the coal before the act of transportation should begin, and must divest itself of every interest therein, either direct or indirect. Counsel were therefore consulted and a plan was adopted. As a business proposition it was evidently indispensable to find a single purchaser who should be able, financially and in other respects, to handle several million tons a year; it was obviously impracticable to dispose of such a quantity by sales in small lots to small dealers, or for small dealers to distribute afterwards to numerous consumers scattered over so wide an area. So large a quantity, needed in so many places at about the same time, could only be handled by some one with large capital and with a well-organized and capable force of agents. It was therefore decided that a New Jersey corporation should be organized, with a capital sufficiently large, and that this corporation should take over the trained and experienced clerks and agents connected with the coal sales department of the railroad's business.

It was recognized as desirable that the relations between the railroad as the seller, and the proposed coal company as the buyer, should be friendly, and in the first instance the stock in the Coal Company was offered only to the shareholders of the Railroad Company. They were expected to accept the offer, and this expectation was realized. As is well known, the defendant railroad has had a prosperous career, and in June, 1909, it had a large cash surplus. Out of this fund it declared a dividend of 50 per cent., and offered to its shareholders the right to use one-half the dividend to buy the shares of the proposed Coal Sales Company at par. The offer was accepted by nearly all the shareholders; the only exceptions were 36 separate interests, representing 2,249 shares. Since that time, however, many changes have taken place among the stockholders of either company. Both stocks are dealt in by the public, one on the Exchange and the other on the curb; the result being that in October, 1913, the shares of the railroad not interested in the Coal Company had increased from 2,249 to 88,716, and the shares in the Coal Company not interested in the railroad had increased to 6,907. The number of shareholders in the Coal Company had become 1,588, and of these 801 were women, either in their own right or as cestuis que trustent.

The capital subscribed and paid in before August 2, 1909, was nearly $6,600,000, but the Railroad Company did not subscribe or pay for a single share, and had no interest therein, direct or indirect. The capital was all subscribed and paid for by individuals; but, as these individuals were also stockholders of the Railroad Company, the government contends (almost solely for this reason) that the two corporations are in effect identical and cannot be regarded as dis-

tinct. If this ground be not well taken, scarcely anything is left of the government's case—certainly nothing that would support a decree. But, if the contention be sound, the case is made out, and accordingly this point is much insisted upon in the brief, where numerous cases are cited and discussed. We do not think it necessary to take them up in detail. Some of them differ essentially from the case at bar in the fact that they disclose fraud or bad faith as an element, whereas here nothing of the kind exists. But we need not discuss these or any other authorities, because the Supreme Court has already declared distinctly the rule for these particular cases, and has determined that a railroad itself might lawfully hold stock in a manufacturing, mining, producing, or owning corporation, upon the single condition that the latter be a bona fide organization. In the Delaware & Hudson Case—on page 415 of 213 U. S., on page 539 of 29 Sup. Ct. (53 L. Ed. 836)—the court said that while the carrier was forbidden to have any interest, direct or indirect, in a legal or equitable sense, in the article or commodity carried, nevertheless this prohibition of the statute ·did "not include * * * articles or commodities manufactured, mined, produced, or owned, etc., by a bona fide corporation in which the railroad company is a stockholder." This would seem to be plain enough, without more; but, as the subject was important, the court returned to it in the Lehigh Valley Case and left no room for doubt. On page 266 of 220 U. S., on page 388 of 31 Sup. Ct. (55 L. Ed. 458), the Chief Justice declared that:

"The prohibitions of the statute were addressed only to a legal or equitable interest in the commodities to which the prohibitions referred; that they therefore did not prohibit a railroad company from transporting commodities mined, manufactured, produced, or owned by a distinct corporation, merely because the railroad company was the owner of some or all of the stock in such corporation."

And on page 271 of 220 U. S., on page 390 of 31 Sup. Ct. (55 L. Ed. 458), the Delaware & Hudson Case is again referred to as holding expressly that:

"Stock ownership by a railroad company in a bona fide corporation, irrespective of the extent of such ownership, did not preclude a railroad company from transporting the commodities manufactured, mined, produced, or owned by such corporation."

We may therefore assert with confidence that, since a railroad itself may own stock in the producing or owning corporation without offending against the statute, no offense is committed although individual subscribers to such stock may also be stockholders in the railroad. No act of Congress or judicial decision has declared it to be illegal for an individual citizen to invest his money in two enterprises, merely because the enterprises may be closely connected. But what the Supreme Court did lay down was this: Although a railroad company may lawfully own stock in a producing or owning corporation, it must not use the power given by such ownership to obliterate the distinction between the two organizations; it must not exert such power so as to commingle indistinguishably the affairs of both, and thus cause both corporations to be one for all purposes; it must not

destroy the entity of the producing or owning corporation, and thus make the two virtually one. If it actually do these forbidden things, then the commodities clause applies and condemns as unlawful such an abuse of a lawful right. But it is the abuse that is unlawful, not the mere existence of the relation or of the right growing out of the lawful ownership of stock.

[2] Let us see, therefore, what has been actually done by the two defendants. The railroad owns no stock, and has no legal or equitable interest, in the Coal Company. As far as the evidence discloses, it has taken little, if any, corporate action, except to authorize the contract hereafter quoted. But we may fairly infer, although there is not much positive evidence on the subject, that the plan carried out was initiated and finally agreed upon by some at least—probably by all, or by a majority—of a comparatively small group of 35 persons who own a controlling interest in the railroad's stock. They (or nearly all of them, 28 or 29 being the number) also own a majority of the Coal Company's stock, and we take it for granted that they actually control both companies. Being majority stockholders, they have a lawful right to exercise the power of control, provided they exercise it for lawful objects. We assume, also, that several other facts upon which the government lays especial stress are due to the will of this controlling group, namely: The facts that the vice president of the Railroad Company, who was the former head of its coal department, became the president of the Coal Company; that a former sales agent of the Railroad Company transferred his services to the Coal Company and has been (and is now) its vice president and general sales agent; that the president of the Railroad Company is a member of the Coal Company's board of directors; and that three other members are sons of directors on the board of the railroad. As far as these facts go, they are pertinent to the government's contention, and are legitimately used in the effort to prove that the two corporations are identical. But of themselves they are not sufficient; no effort has been made to show, and we do not understand the government to suggest, that the sons (who own no stock in the Railroad Company) have been unfaithful to their trust and have betrayed the interests of the Coal Company which they help to direct; there was no serious effort to show that any of the present or former officials of the Railroad Company that are now, or have been, in the Coal Company's service, have used their power or influence improperly. And—what is more to the point in the present inquiry—nothing was offered in denial of what the evidence shows to be a fact, namely, that the Coal Company has never been favored over other shippers of coal by discrimination in rates or in practices, or in facilities or quality of service. As the Supreme Court has recently pointed out in Railroad Company v. United States, 231 U. S. 363, 34 Sup. Ct. 65, 58 L. Ed. ——, where the object of the commodities clause was considered, the evil at which the clause was aimed was the danger that a carrier, if he were also the owner of the goods transported, would favor himself unduly:

"If such carrier hauls for the public and also for its own private purposes. there is an opportunity to discriminate in favor of itself against other shippers in the rate charged, the facility furnished or the quality of the service

rendered. The commodities clause was not an unreasonable and arbitrary prohibition against a railroad company transporting its own useful property, but a constitutional ·exercise of a governmental power intended to cure or prevent the evils that might result if, in hauling goods in or out, the company occupied the dual and inconsistent position of public carrier and private shipper."

[3] The following facts are also pertinent upon the question how far the corporate activities and the actual operations of the two companies have been distinct and separate. In August, 1909, they entered into the contract of which the government complains. A summary of that agreement is given in the bill of complaint:

"That the Railroad Company would sell to the Coal Company all mined, marketable coal then owned, except such as it should elect to retain for use in its business as a common carrier, to be paid for within thirty days at prices designated.

"That the Railroad Company would lease to the Coal Company certain described storage and stocking plants, trestles and docks, and accept in payment 5 per cent. per annum on a valuation to be agreed upon.

"That the Coal Company would take over certain leases of trestles and sale agencies contracts theretofore made by the Railroad Company.

"That the Railroad Company would sell and deliver to the Coal Company, f. o. b. cars at the breakers, all coal thereafter mined by the former from all lands owned or leased by it, together with all coal purchased by it, the amount to be so sold and delivered to be at the absolute option of the seller and without liability upon its part for failure to supply any. The Coal Company agrees to purchase all coal offered by the Railroad Company, and no other, unless necessary to comply with contracts then outstanding.

"That the railroad might retain sufficient coal for its use as a common carrier.

"That the Coal Company would accept from the Railroad Company all coal delivered on cars at the breakers, and pay for all sizes above pea 65 per cent. of the general average f. o. b. prices at tide points at or near New York between Perth Amboy and Edgewater, and for the smaller sizes specified portions of such general average prices.

"That the Coal Company would conduct the business of selling so as to best conserve the interest of and preserve the good will and markets of the coal mined by the Railroad Company; that any disputes which might arise between the parties should be settled through a board of arbitration, made up as specified; and that the terms of the agreement itself might also be modified by arbitration if conditions justified.

· "That the contract should continue to be operative until six months after either party shall notify the other in writing of its intention to cancel the same, and that upon its expiration the Coal Company would sell to the Railroad Company and the latter would buy all coal then stored or in transit theretofore purchased by the former at prices to be agreed upon or fixed by arbitration."

The full text of the contract will be found in the margin.[2]

Since August 2, 1909, when this contract was made, the general course of events may be condensed from the testimony of the prin-

"[2] This contract, entered into this second day of August, 1909, between the Delaware, Lackawanna & Western Railroad Company, hereinafter called the 'seller,' of the first part, and the Delaware, Lackawanna & Western Coal Company, hereinafter called the 'buyer,' of the second part, witnesseth:

"Whereas, the seller is the owner of coal lands situated at various points in the counties of Luzerne and Lackawanna, and the state of Pennsylvania, and has been engaged both in mining the coal therefrom and in transporting to market and selling the same, and in like manner has so transported and sold large amounts of coal purchased by it in said state; and whereas, the

cipal witness in the case: Since that date, the Coal Company has conducted the whole business of marketing the coal referred to in the contract, and the railroad has taken no part therein, except to move the coal in obedience to orders received from the Coal Company. Notice of the change of business was promptly given to agents and customers and the trade in general.. The railroad sells all its coal to the Coal Company on board cars at the breakers, except such quantity as it uses for its own purposes, or permits to be used by its employés. But the Coal Company buys coal from other persons also, the quantity

seller, to so sell its coal, has constructed storage plants and trestles at various points in different states, and has entered into various sales agency contracts; and whereas, to so market said coal most of the same must be transported in interstate commerce, so that it has become necessary for the seller, in compliance with law, to sell all of its coal within the state of Pennsylvania; and whereas, the buyer is desirous of contracting to so purchase all of the seller's coal at its mines, to contract for the transportation of the same to market, and to sell the same and for such purpose to lease of the seller various of its storage plants, trestles, offices, and other facilities, and assume its selling agency contracts:

"Now, therefore, in consideration of the premises, and of the mutual covenants herein contained, it is agreed as follows:

"First. The seller agrees to sell to the buyer, and the buyer agrees to buy of the seller, all mined, marketable coal wherever situated now owned by the seller, and either stored, held at various points, or in the course of transportation, except such coal as the seller elects to retain for its use in the conduct of its business as a common carrier. The buyer shall pay the seller therefor, in cash within thirty days from the date hereof, as follows, viz.: For all of the coal in transit, at prices to include the full tariff charges of the seller and of all other carriers whose charges have been paid by the seller for the transportation of such coal from the mines, together with the market value thereof at the mines as fixed herein, at prices prevailing for the month of July, 1909; for all coal stored, of all sizes, at points west and north of Buffalo, N. Y., the sum of five dollars and fifty cents ($5.50) per gross ton; for prepared sizes of coal stored at Buffalo and at other points along the lines of the owned, leased and controlled lines of the seller, the sum of four dollars ($4.00) per gross ton; for sizes smaller than prepared sizes so stored at Buffalo and points east, along the lines of the seller, not including that stored at or about the mines of the seller, the sum of one dollar ($1.00) per gross ton. The buyer shall also pay an equitable proportion of taxes for the year 1909 assessed or to be assessed against such stored coal.

"The buyer hereby assumes and agrees to pay all unpaid charges of every nature incurred in connection with the tranportation or storage of said coal, and hereby assumes all risks and obligations in connection therewith from the beginning of the day of the date hereof.

"Second. The seller shall lease to the buyer contemporaneously herewith, the following properties: The Checktowage stocking plant, at Buffalo, N. Y.; the Port Morris storage plant, at Port Morris, N. J.; the Dover stocking plant, at Dover, N. J.; the Erie Street lake trestle, at Buffalo, N. Y.; the transfer trestle, at East Buffalo, N. Y.; the lake shipping trestle, at Oswego, N. Y.; the canal trestle, Clinton Street trestle, and Geddes yard trestle, at Syracuse, N. Y.; the canal trestle, at Utica, N. Y.; the retail trestles located, respectively, at Newark, Harrison, Bloomfield, Summit, and Paterson, N. J.; the Division Street dock trestle at Chicago, Ill.; the Wabash dock trestle, at Toledo, Ohio. The rental to be paid the seller by the buyer for the use of said properties shall be five per cent. (5%) of their agreed value, including good will, and the leases shall provide that the buyer shall keep the said properties insured and in repair, and shall contain such other covenants as may be proper to protect the interests of the seller.

"The seller has leased certain of its trestles to different persons, as follows: The Main Street, Erie Street, Chicago Street, Seneca Street, Walden Avenue,

being 3,847 tons in 1909, 2,267 tons in 1910, 6,600 tons in 1911, 9,204 tons in 1912, and 310,645 tons in the first 10 months of 1913. The Coal Company directs the movement of the coal from the breakers (where the title passes from the Railroad Company) until it reaches the numerous markets and customers in Pennsylvania and elsewhere; and the railroad obeys these orders. With the exceptions already noted, the Coal Company has always had a separate board of directors and separate officers. The actual management has also been separate and distinct. The Coal Company has its own officers, and keeps its

and Black Rock trestle at Buffalo, N. Y., to E. L. Hedstrom; the McKinney trestle at Binghamton, N. Y., the Chemung Coal Company trestle at Elmira, N. Y., the Oswego Coal Company trestle at Oswego, N. Y., the Gilmore trestle at Utica, N. Y., the Horre trestle and elevator on pier 5, Hoboken, N. J., Burns Brothers' trestle on property of the seller at South Brooklyn, N. Y., the Klink trestle at Syracuse, N. Y., a coal trestle at Bath, N. Y., and various other trestles located on the lines of its owned, leased, and controlled lines.

"The seller has also entered into sales agency contracts, as follows: With E. L. Hedstrom & Co., Chicago, Ill., S. C. Schenck, Toledo, Ohio, Northwestern Fuel Co., St. Paul, Minn., Milwaukee Western Fuel Co., Milwaukee, Wis., E. L. Hedstrom, Buffalo, N. Y., and Ogdensburgh Coal & Towing Company, of Ogdensburgh, N. Y.

"All of such leases and sales agency contracts shall be taken over by the buyer as of the date hereof, on terms to be agreed upon, and it shall assume all obligations of the seller with respect thereto, and be entitled to the benefits thereof. The buyer also agrees to lease of the seller the coal sales office building at Buffalo and Syracuse, N. Y., rooms in the station of the seller at Scranton, Pa., and suitable quarters at 90 West street, New York City.

"The seller will provide that any of the foregoing properties so to be leased to the buyer which are owned by the Syracuse, Binghamton & New York Railroad Company shall be so leased to it by such corporation.

"The seller has also entered into contracts for the sale of coal for the current year with various customers. A schedule of such contracts shall be prepared and furnished to the buyer by the seller. All of such sales contracts shall be assumed by the buyer as of the date hereof, and it agrees to comply with the terms and conditions of such contracts. The buyer also agrees to assume the obligations of a certain contract entered into October 8, 1905, between Lucy A. Turner and the seller in connection with the business of Henry B. Turner Coal Company at foot of East 23d street, New York, and shall be entitled to the benefits thereof without other consideration than that named herein.

"The seller has entered into a contract, dated June 17, 1905, expiring August 1, 1910, with the Solvay Process Company, of Syracuse, N. Y., providing for the sale of washery coal at prices named therein. It is understood that the buyer shall assume such contract and supply said company with coal at prices named therein. The seller, however, agrees that as the buyer cannot conform to the conditions of such contract without a material loss, it will adjust such loss with the buyer upon an equitable basis on terms to be agreed upon.

"Third. Subject to the conditions of this paragraph, and at the prices herein stated, the seller agrees, during the terms of this contract, to sell to the buyer all coal hereinafter mined by it from all coal lands owned or leased by it, together with all coal it may purchase. The buyer agrees to purchase all such coal at such prices and to pay the seller therefor in cash on the 20th of each month for all coal delivered to it by the seller f. o. b. cars at the mines during the preceding month. The buyer also agrees on the 15th of each month to pay the seller in cash all tariff charges of its owned, leased, and controlled lines, and all moneys advanced by it to other carriers for the transportation of said coal during the preceding month.

"The amount of coal to be so delivered and sold to the buyer by the seller shall be at the absolute option of the seller as its interests may determine, and the seller shall be subject to no liability whatsoever for failure to supply the

own books according to its own method of bookkeeping, and its books relate to its own business. Its funds are deposited in its own name in banks of its own choosing, and are subject to its own disposal. Its earnings are computed from its own books, and the profits go solely to its own stockholders. The sales department of the Coal Company is mainly controlled by its vice president and general sales agent, although its president takes some part in the supervision. The sales agents throughout the territory served with the coal are and always have been in the exclusive employ of the Coal Company, and are paid solely by that company. And this is true, also, of the bookkeeping force in the

buyer with such amount of coal as it may desire. The buyer agrees that, except to enable it to comply with the terms of the existing hereinbefore cited sales agency and other sales contracts of the seller, in the event of the failure of the seller to sell it coal, it will purchase all coal to be sold by it from the seller, and will purchase no coal from any other person or corporation, except with the written consent of the seller.

"The seller reserves the right to retain all coal required by it for the use of its owned, leased and controlled lines in the conduct of their business as common carriers; also such coal as it may desire to sell its employés at the breakers, the same not to be hauled in railroad cars.

"The buyer agrees to pay the seller, and the seller agrees to accept from the buyer, the following prices for said coal, to be delivered f. o. b. railroad cars at the various breakers now located and hereinafter constructed by the seller at its mines aforesaid:

"For all sizes above pea coal, sixty-five (65) per cent. of the general average free on board prices of said sizes received at tide. points at or near New York, between Perth Amboy and Edgewater.

"For pea coal, fifty (50) per cent. of the general average f. o. b. price for pea coal at said tide points at or near New York, when the said price is two dollars and fifty cents ($2.50) per ton or less, and for each advance of ten (10) cents per ton in the said f. o. b. price above two dollars and fifty cents ($2.50) the proportion paid the seller shall be increased one (1) per cent. until the percentage paid for pea coal reaches sixty-five (65) per cent.

"For buckwheat coal No. 1, forty (40) per cent. of the general average f. o. b. price at said tide points at or near New York when the said price is two dollars ($2.00) per ton or less, and for each advance of ten (10) cents per ton in the said f. o. b. price the proportionate price paid the seller shall be increased two (2) per cent. until the said f. o. b. price reaches two dollars and fifty cents ($2.50), after which the proportionate price paid the seller shall advance one (1) per cent. for each ten (10) cents advance in the f. o. b. price above two dollars and fifty cents ($2.50), as in the case of pea coal above mentioned: Provided, that nothing herein contained shall oblige the buyer to pay for buckwheat No. 1 coal a rate higher than for pea coal.

"For all sizes smaller than buckwheat No. 1, the seller shall receive twenty-five (25) cents per ton f. o. b. railroad cars at breakers, and for each ten (10) cents increase in the general average f. o. b. price above one dollar and thirty cents ($1.30) a ton at tide the price shall be increased five cents per ton.

"The general average f. o. b. prices herein referred to shall be determined by the general average free on board prices received for the various sizes on general market sales thereof at tide points at or near New York between Perth Amboy and Edgewater during each calendar month, and a statement of such prices shall be furnished the buyer by the seller prior to the 8th day of each month subsequent to that in which such monthly sales shall have been made—the intent of this provision being to ascertain and to fix the market price of the coal at the mines as nearly as may be as of the several and respective days of delivery of the coal at the mines.

"Payment on the 20th day of each month for coal purchased during the preceding month shall be made at such prices.

"Fourth. The seller agrees that all its coal sold to the buyer shall be prop-

Coal Company's offices. The government has had access to the books and accounts of the Coal Company, and has offered some extracts therefrom in evidence. The Coal Company has been charged, and has paid, the same rates of freight and demurrage as any other shipper, and has received no discriminating favors from the railroad. The transactions of the Coal Company for each of the years 1910, 1911, and 1912, embrace 8,000,000 tons or more, and about $40,000,000.

The Coal Company pays large sums in cash each year to the railroad for coal purchased and for freight. In 1912 the amount paid for coal was nearly $20,000,000, and for freight more than $13,000,000; in 1910, the total of these items was about $34,500,000; and in 1911, $35,000,000. In addition to these sums, the Coal Company paid to other carriers, and to agents for salaries and other charges, from $2,-

erly prepared for market in accordance with the past practice and standards of the seller.

"Fifth. The buyer agrees that at any transfer trestles leased to it by the seller it will transfer from car to car any coal which the seller desires to have transferred, at a price to be agreed upon. It is also understood that the parties hereto shall adjust the charges to be paid by the buyer to the seller for coal forwarded to and unloaded from storage or stocking plants and with respect to other transportation charges to be subsequently covered by tariffs to be filed by the seller.

"Sixth. The buyer agrees that it will conduct the business of selling the coal of the seller in such manner as best to conserve the interests of and preserve the good will and markets of the coal mined by the seller, and to continue to fill the orders of all responsible present customers of the seller even though as to some of such customers the sales may be unprofitable; it being understood and agreed that at the prices above quoted the entire business of the buyer will be conducted at a profit.

"Seventh. In the event of dispute as to tidewater prices or as to the proper interpretation of any provision of this agreement, or if by reason of changes in market conditions, tariff rates or otherwise, modifications or changes in this contract should fairly be made, and the parties hereto cannot agree with respect to such modifications or changes, or if the parties cannot agree as to any matter, it is agreed that all such differences shall be determined by arbitration by a board of arbitrators to consist of one person selected by the general sales agent of the buyer, and one person selected by the president of the seller, and a third person to be selected by the then president of the Farmers' Loan & Trust Company of the City of New York, and that the decision of a majority of such board of arbitration shall be final and binding upon the parties hereto.

"Eighth. Any changes or modifications in the terms, conditions, or covenants of this contract which may hereafter be agreed to may be made by written agreement, duly executed, provided the same be approved by a vote of both the parties hereto acting by a majority of their several boards of directors or managers.

"Ninth. This contract shall become in effect on the beginning of the day of the date hereof upon written notice by either party to the other prior to August 1, 1910, of its intention to cancel this contract, it shall expire at midnight on the 28th day of February, 1911. Should no such notice be served, the contract shall continue to be operative until the expiration of six months after either party shall notify the other in writing of its intention to cancel the contract, in which event it shall expire at midnight of the last day of the six months named in the notice of cancellation.

"Upon the expiration of this contract, the buyer agrees to sell to the seller or to whomever the seller shall nominate, and it agrees to buy or cause to be bought, all coal then stored or in transit purchased of the seller by the buyer, at prices to be agreed upon; or in case the parties cannot agree, to be fixed by arbitration as herein provided."

500,000 to $3,000,000 in each of the years named. For all purposes, the Coal Company has paid, to others than the railroad, more than $7,000,000 in 1910, and also in 1911, and more than $5,000,000 in 1912.

A rental of 5 per cent. on the estimated cost of the railroad's former storage and trestle facilities is paid by the Coal Company, together with the cost of operation and maintenance. Since August, 1909, the Coal Company has been buying other property at various places—mainly land, buildings, and trestles—at a cost of several hundred thousand dollars, and has been making contracts on its own account to supply certain agents with coal for a definite number of years. It obtains some of its coal from other sources of supply than the Railroad Company, although the railroad is by far the most important source. And, finally, it may be noted that several unadjusted differences exist between the two companies, one being the railroad's claim to receive a higher price for its coal.

We are asked to hold that the facts thus set forth do not establish the good faith of the railroad, and therefore to decree that the company's interest in the coal transported continues to exist, in spite of the contract of August 2, 1909, and of the whole course of conduct hereinbefore detailed. The government prays that we enjoin the defendant from "shipping, transporting, or causing to be transported, any anthracite coal, the product of mines owned by defendant railroad company, or purchased by it from others, and sold, transferred, or delivered to defendant coal company, in pursuance of the above-described agreement or arrangement existing between them, or any similar one." Manifestly, a decree that goes so far and would destroy so much should rest upon well-established facts, and these in our opinion have not been proved; the evidence is too slender to justify us in drawing the inferences urged by the government. On the contrary, believing that we have fairly stated the uncontroverted facts, we shall only add that they appear to lead to these conclusions: That the transactions between the two companies began and have been carried on in good faith, in obedience to the decisions of the Supreme Court and in reliance thereon; that the distinction between the two corporations has not been obliterated; that their affairs have not been so commingled as by necessary effect to make their affairs indistinguishable; and that the two are not one for all purposes, but are two distinct and separate legal beings, actually engaged in separate and distinct operations. It follows that the railroad does not own the coal in question, either in whole or in part, during its carriage, but has in good faith dissociated itself therefrom before the beginning of the act of transportation.

2. But the government contends, further, that the Railroad Company retains a direct or indirect interest in the larger sizes of the coal while it is being transported, because the contract contained a provision relating to the price to be paid for these sizes. Coal larger than pea is called "prepared" coal, and for this size the third paragraph of the contract provides that the Coal Company shall pay "sixty-five (65) per cent. of the general average free on board prices of said sizes received at tide points at or near New York between Perth Amboy and Edgewater."

The same paragraph makes somewhat similar provisions for ascertaining the prices to be paid-for the smaller sizes; these are also to be paid for on the basis of certain percentages of the general average free on board prices at tide. It is not contended, however, that the railroad retains any interest in these smaller sizes; the argument is restricted to "prepared" coal, or sizes larger than pea. It is urged that the railroad will be the gainer by a high price at tide, since this will necessarily increase the price at the mines, and, therefore, that this interest in the price is such an interest in the coal itself as is condemned by the statute. Undoubtedly it is correct to say that the railroad has an interest in the price; but it should be understood that "interest" merely means that the railroad will gain by a higher price at tide, and does not mean that the railroad has power to control the coal or the price for which it sells. It might also be argued—and, indeed, the suggestion is glanced at in the government's brief—that the price at tide is also affected by the rate of freight, and therefore that the railroad retains an interest in the coal because it can increase the tidewater price by increasing the rate of freight. In theory this argument may be sound, but as a practical consideration it is not entitled to weight, because the railroad cannot increase the rate of freight at pleasure, but must accept whatever rate is established by the Interstate Commerce Commission. And the other argument, while equally good in theory, is equally ineffective as a practical consideration, because the Railroad Company does not control the price at tide, and cannot increase that price, however much it may desire to do so. The Railroad Company does not fix prices; it does not decide how much coal is to go to New York harbor; and it does not determine the sum for which the coal is to be sold at that point. The average price at tide had its origin a good many years ago, when the coal-carrying roads had contracted with numerous mine owners to buy their coal at certain percentages of the average selling price at the harbor. In order to determine what that price was, records were kept by a bureau organized for that purpose, showing the quantities sold and the prices. This was the situation in 1902, when the notable strike in the anthracite region took place, and one of the terms of the award that settled that struggle was a sliding scale of wages to be determined by reference to the selling prices reported by the bureau. These prices have been so reported ever since, in accordance with the order of the Strike Commission, and wages have been computed by reference thereto.

This price at tide afforded the present defendants a convenient basis for calculation. It has certain obvious advantages; the market in New York harbor is very large, probably the largest single market available; it is served by all the principal coal companies; and the general average of prices obtained there may fairly be regarded as an accurate measure of value at that point. But the purpose of the third paragraph of the contract was to value the coal at the breakers, and the New York price merely afforded a starting point for the computation. The contract declares this purpose distinctly:

"The general average f. o. b. prices herein referred to shall be determined by the general average free on board prices received for the various sizes on general market sales thereof at tide points at or near New York between

Perth Amboy and Edgewater during each calendar month, and a statement of such prices shall be furnished the buyer by the seller prior to the 8th day of each month subsequent to that in which such monthly sales shall have been made—the intent of this provision being to ascertain and to fix the market price of the coal at the mines as nearly as may be as of the several and respective days of delivery of the coal·at the mines."

We think it clear that after the title passes to the Coal Company at the mines the railroad retains nothing more than an interest in the price, and that this is not the same thing as an interest in the coal. But the commodities clause is dealing with an "interest, direct or indirect," in the commodities themselves, and this must mean some kind or degree of ownership or interest in the thing transported, or some power to deal with it or to control it. We think we have already shown that the Railroad Company neither owns nor controls the coal after it has been loaded on cars at the breakers. Thereafter the Coal Company is the owner and the master, and fixes prices, routes, and destinations, at its own will. The Railroad Company has parted with its title so completely that it would suffer no loss if thousands of tons should be burnt or otherwise lost in transit. No doubt the railroad will be advantaged whenever the price at tide is high, but the railroad does not increase that price or compel the Coal Company to increase it.

But it seems superfluous to consider the government's argument further, in view of what was said by the Supreme Court in the Delaware & Hudson Case about the meaning of this very phrase—"in which [the railroad] may have any interest, direct or indirect." On page 413 of 213 U. S., on page 538 of 29 Sup. Ct. (53 L. Ed. 836), the court said:

"It remains to determine the nature and character of the interest embraced in the words 'in which it is interested directly or indirectly.' The contention of the government that the clause forbids a railroad company to transport any commodity manufactured, mined or produced, or owned in whole or in part, etc., by a bona fide corporation in which the transporting carrier holds a stock interest, however small, is based upon the assumption that such prohibition is embraced in the words we are considering. The opposing contention, however, is that interest, direct or indirect, includes only commodities in which a carrier has a legal interest, and therefore does not exclude the right to carry commodities which have been manufactured, mined, produced or owned by a separate and distinct corporation, simply because the transporting carrier may be interested in the producing, etc., corporation as an owner of stock therein. If the words in question are to be taken as embracing only a legal or equitable interest in the commodities to which they refer, they cannot be held to include commodities manufactured, mined, produced or owned, etc., by a distinct corporation merely because of a stock ownership of the carrier. Pullman Palace Car Co. v. Missouri Pac. R. R., 115 U. S. 587 [6 Sup. Ct. 194, 29 L. Ed. 499]; Conley v. Mathieson Alkali Works, 190 U. S. 406 [23 Sup. Ct. 728, 47 L. Ed. 1113]. And that this is well settled also in the law of Pennsylvania is not questioned. It is unnecessary to pursue the subject in more detail, since it is conceded in the argument for the government that, if the clause embraces only a legal interest in an article or commodity, it cannot be held to include a prohibition against carrying a commodity, simply because it had been manufactured, mined or produced, or is owned, by a corporation in which the carrier is a stockholder."

If we remember that this language was used about a situation arising where a railroad itself owned stock (even in a controlling amount) in the producing or owning corporation, and where the railroad would

therefore profit directly by the price received for the commodity transported, it hardly seems worth while to argue at any length that, where the railroad does not own a single share of such stock, it does not have an "interest, direct or indirect," in the particular commodity thus produced or owned. In such a state of affairs—if we understand correctly what the Supreme Court has said—the interest of the carrier ceases when the commodity is sold and delivered bona fide to a distinct and separate corporation, and no interest remains, either direct or indirect, merely because the price has not yet been precisely ascertained.

3. The bill of complaint also makes a formal charge against both defendants under the Anti-Trust Act (Act July 2, 1890, c. 674, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); but the oral argument left us under the impression that this charge was not much insisted on. We believed then, and have believed since, that, while the government earnestly desired to obtain a decision concerning the application of the commodities clause to the facts of this case, the anti-trust branch of the complaint was regarded as comparatively unimportant. For this reason, therefore, we shall not undertake for the present what we think would be the needless task of discussing the evidence bearing upon the charge of restraining or monopolizing commerce. If we are mistaken in this supposition, however, the error can easily be corrected.

A decree may be entered dismissing the bill; but as the situation may change in the future, and the change may afford the government ground to assert that the affairs of the two corporations have become unlawfully identified, so as to violate the commodities clause, the dismissal will be without prejudice to the government's right to begin a second proceeding whenever it may be so advised.

