# UNITED STATES *v.* LEHIGH VALLEY RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 536.   Argued January 5, 1911.—Decided April 3, 1911.

The rule that the allowance of amendments to pleadings is discretionary with the trial court and not to be reviewed on appeal except in case of gross abuse does not apply where such discretion is controlled by this court and the refusal to allow an amendment defeats the evident purpose of this court in remanding the case.

Where the refusal of the Circuit Court to allow an amendment is in conflict with the opinion and mandate of this court there is an abuse of discretion which this court can and will correct on appeal, even if such abuse be the result of misconception of the opinion and of the scope of the mandate.

While the decision of this court in this and other commodities clause cases, 213 U. S. 366, expressly held that under the commodities clause stock ownership by a railroad company in a *bona fide* corporation, irrespective of the extent of such ownership, does not preclude the railroad company· from transporting the commodities manufactured, produced or owned by such corporation, it is still open to the Government to question the right of the railroad company to transport commodities of a corporation in which the company owns stock and uses its power as a stockholder to obliterate all distinctions between the two corporations; and an amendment to the original bill in one of the commodities cases alleging such facts as show the absolute control by the defendant railroad company, through stock ownership, over the corporation whose commodities are being transported, is germane to the original bill and should have been allowed by the trial court.

By the operation and effect of the commodities clause a duty has been cast upon an interstate carrier not to abuse its power as a stockholder of a corporation whose commodities it transports in interstate commerce by so commingling the affairs of that corporation with its own as to cause the two corporations to become one and inseparable.

VOL. CCXX—17

THE facts are stated in the opinion.

*Mr. Wade H. Ellis*, Assistant to the Attorney General, with whom *The Attorney General* and *Mr. Edwin P. Grosvenor*, Special Assistant to the Attorney General, were on the brief, for appellant:

The Government's right to proceed in this case is not foreclosed by the previous decision of this court in 213 U. S. 366. The facts now sought to be shown by the amendment of the Government in the court below are not the same as those which were before this court on the former appeal.

The stipulation of counsel in the original case was that the submission of the case on bill and answer should in no wise prejudice the parties in any suit or proceeding thereafter instituted.

In the recent case of *United States* v. *Reading Co.*, 183 Fed. Rep. 427, 461, 462, it has been found that the Lehigh Valley Coal Company is a mere department of the Lehigh Valley Railroad Company, and not an independent corporation.

The construction by this court of the commodities clause shows that it applies when the commodity has been manufactured, mined or produced by a carrier or under its authority and at the time of transportation the carrier has not in good faith dissociated itself from such commodity; when a carrier owns the commodity transported in whole or in part; and when a carrier at the time of transportation has an interest in the commodity, direct or indirect, but not including an interest represented only by the ownership of stock in a "separate," "distinct" and "*bona fide*" corporation.

It follows that in the present case the railroad company, as shown by the proposed amendment of the bill, is violating the commodities clause in two of the three ways indicated above.

Without regard to stock ownership, the coal transported by the Lehigh Valley Railroad Company was mined and produced "under its authority," and the railroad company has not dissociated itself from such commodity. *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Harriman* v. *Northern Securities Co.*, 197 U. S. 244; *N. Y., N. H. & H. R. R. Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, 390. In other words, if the Lehigh Valley Railroad Company did not own a single share of the stock of the coal company in the present case it could not lawfully transport the coal, and certainly it cannot get that authority simply because it owns all the stock of the coal company.

The coal company is not a separate, distinct and *bona fide* corporation. *In re Watertown Paper Co.*, 169 Fed. Rep. 252; *In re Muncie Pulp Co.*, 139 Fed. Rep. 546; *Interstate Telegraph Co.* v. *Baltimore & Ohio R. R. Co.*, 51 Fed. Rep. 49.

It can make no difference in this case that the coal company was organized before the passage of the commodities clause and before the former decision of this court construing that act, for it is the effect of a relation between a railroad and a coal company, and not the motive, which constitutes a violation of the statute.

The fiction of a separate corporate entity will be disregarded whenever it is insisted upon as a protection to an illegal transaction. *In re Rieger, Capnor and Aultmark*, 157 Fed. Rep. 609; *Miller & Lux* v. *East Side Canal & Irrigation Co.*, 211 U. S. 293; *Lehigh Mining & Mfg. Co.* v. *Kelley*, 160 U. S. 327; *Gas Co.* v. *West*, 50 Iowa, 16; *Booth* v. *Bunce*, 33 N. Y. 139; *Bennett* v. *Minott*, 28 Oregon, 389; Morawetz on Corp., §§ 1, 227.

The court below erred in not allowing the Government to amend its bill of complaint; first, because it had no discretion in the matter; 3 Ency. Law & Prac. 579; *National Bank* v. *Carpenter*, 101 U. S. 567, 568; and second,

because if it had such discretion this was abused. *House
v. Mullen*, 22 Wall. 42; *Rio Grande Dam &c. Co.* v. *United
States*, 215 U. S. 266; *Texas & Pacific Railway* v. *Inter-
state Transp. Co.*, 155 U. S. 585; *Swan Land & Cattle
Co.* v. *Frank*, 148 U. S. 603; *Kendig* v. *Dean*, 97 U. S. 423;
*Durant* v. *Essex Co.*, 7 Wall. 107.

There are important considerations of public policy
which weigh against any construction of the commodities
clause which would offer inducements to the railroads to
organize subsidiary companies to deal in commodities in
competition with other shippers. There is no reason for
denying to railroads the right to invest their funds in the
stock of other corporations, where such other corpora-
tions are separate and distinct from the carrier's business.
But where a railroad company organizes a subsidiary cor-
poration not for the purpose of investing its funds but to
make its profits out of the transportation of the com-
modity produced, the temptation of the carrier is to in-
crease the rates of transportation to all so that no one can
afford to deal in the article except the railroad which trans-
ports it. The consequences of confirming in the railroads
such unlimited power are well stated in the English case
of *Attorney General* v. *Great Northern R. R. Co.*, 29 L. J.
Ch. (N. S.) 794, cited in the *New Haven Case*, 200 U. S. 393.

The interpretation of the commodities clause contended
for by the Government in this case would make unneces-
sary an amendment by Congress forbidding railroads to
transport, in interstate commerce, the product or property
of corporations in which their only interest is the ownership
of stock, for it would make vital and effective the act as it
stands by so construing it as to forbid railroads to trans-
port commodities of other corporations where such other
corporations are not in fact separate, independent enter-
prises but are mere departments of the railroads. And
this last was the real evil which the commodities clause
was intended to remedy.

*Mr. John G. Johnson,* with whom *Mr. J. F. Schaper-kotter* and *Mr. Frank H. Platt* were on the brief, for appellee:

The only question left in the case on its return to the Circuit Court was whether the defendant was violating the commodities clause by carrying the coal produced and owned by the Lehigh Valley Coal Company, whose capital stock was entirely owned by the defendant, and that of other coal companies in which the defendant had stock interests, entire or part, either majority or minority, respectively.

The complainant's motion for leave to file an amended bill of complaint was rightly denied.

The general replication had been filed and not withdrawn. Irrespective of Equity Rule 29, with which the Government wholly failed to comply, no cause was shown for leave to file an amended bill other than that which appeared on the face of the proposed amendment itself. Nothing had occurred since the original bill was filed except that this court had held that the Government's theory of the law was erroneous. There was no averment of after-discovered matter. The refusal of leave to amend the bill was discretionary, and is not reviewable. *Michigan Central Ry. Co.* v. *Pinkney,* 149 U. S. 194, 201; *Chapman* v. *Barney,* 129 U. S. 677, 681; *Bullitt Co.* v. *Washer,* 130 U. S. 142, 145.

The complainant's motion for a decree dismissing the bill of complaint without prejudice was rightly denied. *Pullman's Car Co.* v. *Transportation Co.,* 171 U. S. 138, 146; *Stevens* v. *The Railroads,* 4 Fed. Rep. 97, 105; *Chicago & Alton R. R. Co.* v. *Union Rolling Mill Co.,* 109 U. S. 702, 713; *Connor* v. *Drake,* 1 Ohio, 170.

A dismissal without prejudice would have seriously prejudiced the rights of the defendant. It was clearly within the discretion of the court to deny the motion for a dismissal without prejudice, which would have opened the

door for the bringing of a new suit in which the complainant would have all of the advantage growing out of the admissions set forth in the answer. *American Bell Telephone Co.* v. *Western Union Tel. Co.*, 69 Fed. Rep. 666, 670.

It was clearly within the discretion of the court to refuse to deprive the defendant of this right by means of a dismissal without prejudice. *Hershberger* v. *Blewett*, 55 Fed. Rep. 170, 171; *Flaherty* v. *McCormick*, 14 N. E. Rep. 846, 850; *Georgia Pine Turpentine Co.* v. *Bilfinger*, 129 Fed. Rep. 131; *Ebner* v. *Zimmerly*, 118 Fed. Rep. 818.

The decision of the Circuit Court was in conformity with the opinion of this court.

The character of a coal company,—whether it be *bona fide*, or not, within the meaning of this court—cannot depend on the extent or proportion of the capital stock held by the railroad company. A railroad company owning three-quarters, or more than half, of the stock of a coal company controls its management through election as completely as it would by owning the entire capital stock. The fact of entire or majority ownership, is, therefore, not logically more relevant to the issue of *bona fides* than minority ownership, unless this court intended to hold that every majority holding constitutes *mala fides*. Obviously the decision of this court is that the question of *bona fides* shall not depend on stock holding.

The relationship between the defendant and the coal company has from its inception existed under the direct authority of law, both of the State of Pennsylvania and the Federal Government. As to the State of Pennsylvania, under whose laws the coal company was organized, it is alleged and conceded that such organization and such relationship were allowed and encouraged by the legislative policy of the State of Pennsylvania. As to the Federal laws, there is the direct interpretation of the Interstate Commerce Act in the *Chesapeake and Ohio*

*Case,* 200 U. S. 361, 401, to the effect that the relationship was legal. And see *Haddock and Coxe Cases,* 4 I. C. C. Rep. 296, 535.

The relationship which the Government now seeks to have declared so lacking in good faith as to render the existence of the coal company a mere fiction, forms the basis of the very rights from which arose the grave and doubtful constitutional questions which this court found it unnecessary to decide. Upon the strength of the relationship existing between the defendant and the coal company millions of dollars have changed hands, pursuant to transactions whose good faith cannot be questioned.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

This case is one of what were known as the commodities cases previously decided and reported in *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366. The controversy now is but a sequel to that disposed of in the previous cases. To understand the question now for consideration it is essential to have in mind the contentions which arose for decision upon the previous appeal and the disposition which was made of them. We therefore refer to those subjects.

The United States proceeded, both by suits in equity and mandamus, against certain railroad companies, including the Lehigh Valley, to prohibit them from transporting coal in interstate commerce in violation of what were deemed to be the prohibitions of the fifth paragraph of the first section of the act to regulate commerce as amended on June 29, 1906, usually referred to as the commodities clause of the Hepburn Act. The clause is as follows:

"From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport

from any State, Territory, or the District of Columbia, to
any other State, Territory, or the District of Columbia, or
to any foreign country, any article or commodity, other
than timber and the manufactured. products thereof,
manufactured, mined or produced by it, or under its au-
thority, or which it may own in whole, or in part, or in
which it may have any interest, direct or indirect, except
such articles or commodities as may be necessary and in-
tended for its use in the conduct of its business as a com-
mon carrier." 34 Stat. 584, c. 3591.

In effect, the contention of the Government was that
the clause in question prohibited railroad companies from
moving in the channels of interstate commerce articles or
commodities other than the articles excepted by the pro-
vision which had been manufactured, mined or produced
by the companies or under their authority or which were
at the time of the transportation owned by them or which
had been previously owned by them in whole or in part
or in which the companies then or previously had any in-
terest, direct or indirect. The Government, moreover,
insisted that these general propositions embraced the
movement by the companies in interstate commerce of a
commodity which had been manufactured, mined or pro-
duced by a corporation in which the transporting railroad
company was a stockholder, irrespective of the extent of
such stock ownership. The railroad companies in effect
defended the suits upon the ground that the statute as
construed by the Government was repugnant to the Con-
stitution. Each of the cases was submitted upon bill and
answer and petition and return to the Circuit Court of the
United States for the Eastern District of Pennsylvania,
held by three circuit judges under the Expediting Act of
February 11, 1903. 32 Stat. 823, c. 544. The submission
in each case was made as a result of a stipulation between
counsel "that the submission on bill and answer and any
averment or admission in the pleadings of either party

shall in no wise prejudice the said parties in any other suit or proceeding heretofore or hereafter instituted, and shall be operative and take effect only with respect to the present suit and for the purpose thereof."

Treating the commodities clause in question as having the significance attributed to it by the United States the court held it to be repugnant to the Constitution. Judgments and decrees were accordingly entered, denying the applications for mandamus and dismissing the bills of complaint. The reasons which led to this action were expounded in one opinion, made applicable to all the cases, the court briefly but comprehensively stating the facts in each case which were relied upon by the Government as bringing the defendant corporation within the clause as the Government construed it. The cases were then brought here.

As was done in the lower court, the cases here were all disposed of by one opinion, the facts in each case as summarized by the court below being stated. In deciding the cases it became necessary first to ascertain the meaning of the commodities clause. In performing this duty the conclusion was reached that the clause did not have the far-reaching significance attributed to it by the Government and which had been substantially adopted by the court below, but on the contrary had a much narrower meaning. Attention was directed to the fact that the statute disjunctively applied four generic prohibitions, that is, it forbade a railway company from transporting in interstate commerce articles or commodities, 1, which it had manufactured, mined or produced; 2, which have been so mined, manufactured or produced under its authority; 3, which it owns in whole or in part; and, 4, in which it has an interest, direct or indirect. All these prohibitions, however, were held to have but a common purpose, "that is, the dissociation of railroad companies prior to transportation from articles or commodities, whether the as-

sociation resulted from manufacture, mining, production or ownership, or interest, direct or indirect."

In coming to determine whether the Government was correct in its contention that these prohibitions operated to prevent a railroad company from transporting a product because it was owned by or had been mined, manufactured or produced by a corporation in which the railroad company was the owner of stock, irrespective of the amount of such stock ownership, it was expressly decided that the prohibitions of the statute were addressed only to a legal or equitable interest in the commodities to which the prohibitions referred, that they therefore did not prohibit a railroad company from transporting commodities mined, manufactured, produced or owned by a distinct corporation, merely because the railroad company was the owner of some or all of the stock in such corporation.

Summing up its review as to the true construction of the commodities clause, the court held (p. 415) that it prohibited "a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions: (a) When the article or commodity has been manufactured, mined or produced by a carrier or under its authority, and at the time of transportation the carrier has not in good faith before the act of transportation dissociated itself from such article or commodity; (b) When the carrier owns the article or commodity to be transported in whole or in part; (c) When the carrier at the time of transportation has an interest, direct or indirect, in a legal or equitable sense, in the article or commodity, not including, therefore, articles or commodities manufactured, mined or produced or owned, etc., by a *bona fide* corporation in which the railroad company is a stockholder."

Thus construed, the clause was held to be within the

power of Congress to enact. As this conclusion rendered it necessary to reverse the action of the court below which had been exclusively predicated upon the unconstitutionality of the statute, the question arose as to what disposition should be made of the cases. That is to say, the constitutionality of the statute being settled and its true meaning being expounded, the question was whether the cases should be finally disposed of or should be left in such a position as to give the Government the right to proceed to apply and enforce the prohibitions of the statute against the various corporations which were defendants if it deemed a good case existed for so doing. Disposing of this subject in the light of the consent upon which the cases had been tried in the court below, and of the error which had obtained as to the true meaning of the statute and of the consequent concentration of the attention of the court and of the parties to the question of the constitutionality of the statute, instead of its application to the facts, when correctly construed, it was determined that the decree should not conclude the right of the United States in the respective causes to further proceed to enforce the statute as construed, and hence that that subject should be left open for future action. Referring to this matter, it was said (p. 418):

"As the court below held the statute wholly void for repugnancy to the Constitution, it follows from the views which we have expressed that the judgments and decrees entered below must be reversed. As, however, it was conceded in the discussion at bar that in view of the public and private interests which were concerned, the United States did not seek to enforce the penalties of the statute, but commenced these proceedings with the object and purpose of settling the differences between it and the defendants concerning the meaning of the commodities clause and the power of Congress to enact it as correctly interpreted, and upon this view the proceedings were

heard below by submission upon the pleadings, we are of
opinion that the ends of justice will be subserved, not by
reversing and remanding with particular directions as to
each of the defendants, but by reversing and remanding
with directions for such further proceedings as may be
necessary to apply and enforce the statute as we have
interpreted it."

Accordingly, the mandate of this court provided that
the cause "be, and the same is hereby, remanded to the
said Circuit Court for further proceedings in conformity
with the opinion of this court."

Upon the filing of the mandate the court below vacated
its decree dismissing the bill in this (the equity) cause,
and reinstated the case upon the docket. The United
States then presented an amended bill and asked leave to
file it. The amendment contained copious averments in
regard to the actual relations existing between the rail-
road company and one of the coal companies mentioned
in the original bill, viz., the Lehigh Valley Coal Company.
In substance it was averred that as to this particular coal
company the railroad company was not only the owner of
all the stock issued by the coal company, but that the
railroad company so used the power thus resulting from
its stock ownership as to deprive the coal company of all
real, independent existence and to make it virtually but
an agency or dependency or department of the railroad
company. In other words, in great detail facts were
averred which tended to establish that there was no dis-
tinction in practice between the coal company and the
railroad company, the latter using the coal company as a
mere device to enable the railroad company to violate the
provisions of the commodities clause. It was expressly
charged that in consequence of these facts:

"The coal company is not a *bona fide* mining company,
but is merely an adjunct or instrumentality of the de-
fendant. The defendant is in legal effect the owner of

and has a pecuniary interest in the coal mined by the coal company, and which is transported by the defend-ant."

Not only was it thus charged that the railroad company used its stock ownership to so commingle the operating of the affairs of the mining company with its own as to ren-der it impossible to distinguish as a matter of fact be-tween them, but it was moreover expressly in substance charged that exerting its influence as the owner of all the stock of the coal company the railroad company caused the coal company to buy up all the coal produced by other mining companies in the area tributary to the railroad and fix the price at which such coal was bought so as to control the same and the transportation thereof and es-tablish the price at which the coal thus ostensibly ac-quired by the coal company by purchase should be sold when it reached the seaboard.

It was charged that by these abuses the production, shipment and sale of all the coal within the territory served by the railroad company was brought within the dominion of that company practically to the same extent as if it was the absolute owner of the same. Finally it was alleged as follows:

"That by virtue of the facts hereinbefore set out and otherwise, and more particularly by virtue of the control, direction, domination, and supervision exercised by the persons who are the officers of the defendant railroad and by the defendant over all the operations of the said coal company, embracing the mining and production of said coal, the shipment and transportation of the same over the defendant railroad, and the sale thereof at the sea-board, it follows:

"First. That the coal company, not being in substance and in good faith a *bona fide* corporation, separate from the defendant, but a mere adjunct or instrumentality of the defendant, the defendant, at the time of transporta-

tion, has an interest, direct or indirect, in a legal or equitable sense, in said coal.

"Second. That said coal of said coal company is mined and produced under the authority of defendant, and the defendant at the time of transportation and before the act of transportation has not in good faith dissociated itself from all exercise of authority over said coal but continues to exercise authority over said coal at the time of transportation and over the subsequent sale thereof."

On the objection of the railway company the court denied the request of the United States for leave to file the amended bill. The United States then moved for a decree dismissing its original bill without prejudice, and after argument that motion also was denied. Thereupon counsel for the railroad company moved to dismiss the bill absolutely, and upon the statement of counsel for the United States that it "would not proceed any further in view of the fact that the proposed amendment had been disallowed," the court reached the conclusion "that the bill should be dismissed absolutely upon the allegations of the bill and answer." A decree to that effect was entered, and the Government prosecutes this appeal, relying for reversal upon the error which it is insisted was committed in refusing to allow the proposed amended bill to be filed and in dismissing the suit.

At the threshold it is insisted by the railroad company that the action of the court below in refusing to permit the proposed amendment, however germane that amendment may have been to the cause of action stated in the original bill and even although the subject-matter of the amendment was not foreclosed by our previous decision, is not susceptible of being reviewed, because the allowance of amendments to pleadings is discretionary with a trial court, and the action of the court below in refusing to permit the amendment, even though erroneous, may not be reversed for error unless a gross abuse of discretion was

committed. The principle is elementary, but is inapplicable to this case for a twofold reason: First, because the analysis which we have hitherto made of the opinion of this court on the prior hearing makes it certain that the undoubted object was not to foreclose the right of the Government to enforce in the pending causes the commodities clause as correctly construed, and therefore in this regard the discretion of the court below was controlled by the action of this court. Second, because, in view of the express reservations in the opinion and the explicit language of the mandate of this court, the conclusion cannot be escaped that an absolute abuse of discretion resulted from refusing to permit the amendment, even although such abuse was obviously occasioned by a misconception of the character of the action of this court and the scope of the mandate.

It remains only to consider, first, whether the proposed amendment was germane to the original cause of action, and if it was, whether it was foreclosed by our previous decision.

As to the first question. When it is borne in mind that the suit was brought by the Government to enforce as against the defendant the commands of the commodities clause, the fact that the proposed amendment was germane to such cause of action is too apparent to need anything but statement. Indeed, in the argument at bar on behalf of the railroad company this is in effect conceded, since it is insisted that the amendment should not have been allowed, because in substance its averments virtually constituted part of the original cause of action. And we think it is equally clear that the grounds of the amendment were not foreclosed by our former decision. While that decision expressly held that stock ownership by a railroad company in a *bona fide* corporation, irrespective of the extent· of such ownership, did not preclude a railroad company from transporting the commodities manu-

factured, mined, produced or owned by such corporation, nothing in that conclusion foreclosed the right of the Government to question the power of a railroad company to transport in interstate commerce a commodity manufactured, mined, owned or produced by a corporation in which the railroad held stock and where the power of the railroad company as a stockholder was used to obliterate all distinctions between the two corporations. That is to say, where the power was exerted in such a manner as to so commingle the affairs of both as by necessary effect to make such affairs practically indistinguishable and therefore to cause both corporations to be one for all purposes. To what extent the amendment charged this to be the case will become manifest by again particularly considering its averments concerning the use by the railroad company of the coal company as a purchaser of coal, as also the direct charge made in the proposed amendment that by such acts the railroad company was enabled to control all or a greater portion of the coal produced in the region tributary to its road, and thus to dominate the situation and fix the price, not only at which all the coal could be bought, but at which it could be sold at the seaboard for consumption.

That the facts thus averred and the other allegations contained in the proposed amended bill tended to show an actual control by the railroad company over the property of the coal company and an actual interest in such property beyond the mere interest which the railroad company would have had as a holder of stock in the coal company is, we think, clear. The alleged facts, therefore, brought the railroad company, so far as its right to carry the product of the coal company is concerned, within the general prohibitions of the commodities clause, unless for some reason the right of the railroad company to carry such product was not within the operation of that clause. The argument is that the railroad company was so excepted, because any control which it exerted or interest

which it had in the product of the coal company resulted from its ownership of stock in that company, and would not have existed without such ownership. The error, however, lies in disregarding the fact that the allegations of the amended bill asserted the existence of a control by the railroad company over the coal corporation and its product, rendered possible, it is true, by the ownership of stock, but which was not the necessary result of a *bona fide* exercise of such ownership and which could only have arisen through the use by the railroad of its stock ownership for the purpose of giving it, the railroad company, as a corporation for its own corporate purposes, complete power over the affairs of the coal company, just as if the coal company were a mere department of the railroad. Indeed, such a situation could not have existed had the fact, that the two corporations were separate and distinct legal entities been regarded in the administration of the affairs of the coal company. Granting this to be the case, however, it is in effect urged, as the railroad company held all the stock in the coal company, and therefore any gain made or loss suffered by that company would be sustained by the railroad company, no harm resulted from commingling the affairs of the two corporations and disregarding the fact that they were separate juridical beings, because ultimately considered they were but one and the same. This, however, in substance but amounts to asserting that the direct prohibitions of the commodities clause ought to have been applied to a case of stock ownership, particularly to a case where the ownership embraced all the stock of a producing company, and therefore that a mistake was committed by Congress in not including such stock ownership within the prohibitions of the commodities clause. We fail, however, to appreciate the relevancy of the contention. Our duty is to enforce the statute, and not to exclude from its prohibitions things which are properly embraced within them. Coming to

discharge this duty it follows, in view of the express prohibitions of the commodities clause, it must be held that while the right of a railroad company as a stockholder to use its stock ownership for the purpose of a *bona fide* separate administration of the affairs of a corporation in which it has a stock interest may not be denied, the use of such stock ownership in substance for the purpose of destroying the entity of a producing, etc., corporation and of commingling its affairs in administration with the affairs of the railroad company, so as to make the two corporations virtually one, brings the railroad company so voluntarily acting as to such producing, etc., corporation within the prohibitions of the commodities clause. In other words, that by operation and effect of the commodities clause there is a duty cast upon a railroad company proposing to carry in interstate commerce the product of a producing, etc., corporation in which it has a stock interest not to abuse such power so as virtually to do by indirection that which the commodities clause prohibits, a duty which plainly would be violated by the unnecessary commingling of the affairs of the producing company with its own, so as to cause them to be one and inseparable.

Deciding, as we do, that error was committed in denying leave to file the proposed amended bill, the decree below is reversed and the cause remanded with directions for further proceedings in conformity with this opinion.