UNITED STATES v. LEHIGH VALLEY R. CO. et al.

(District Court, S. D. New York. December 21, 1914.)

No. 11—129.

MONOPOLIES ☞16—CARRIERS OWNING COAL MINES — REGULATION — INTER-
STATE COMMERCE—"DISSOCIATION OF INTEREST."
Where a railroad company has acquired about 13 per cent. of contigu-
ous coal mining lands, the acreage of which represents less than 27 per
cent. of the coal lands naturally tributary to it, and carries about 18 per
cent. of all the coal transported, of which percentage four-fifths comes
from mines controlled by a company in turn controlled by the carrier, but
where there is an honest "dissociation of interests" between coal owner
and coal carrier, which is merely the lawful conduct of honest men, and
where the carrier does not own stock in any company selling coal beyond
the limits of the state wherein the composite business of owning, mining,
transporting, and selling coal is legal, there is no monopoly of interstate
commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig.
☞16.]

In Equity. Suit by the United States of America against the
Lehigh Valley Railroad Company and others for a violation of the
Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209), and the Com-
modities Clause of the Act of June 29, 1906, c. 3591, 34 Stat. 585
(Comp. St. 1913, § 8563). Bill dismissed.

The Attorney General, represented by Thurlow M. Gordon, of
Washington, D. C., and Arthur W. Machen, Jr., of Baltimore, Md.,
for the United States.

John G. Johnson, of Philadelphia, Pa., and E. H. Boles, of New
York City, for Lehigh Valley R. Co. and others.

Everett Warren, of Scranton, Pa., for Lehigh Valley Coal Sales Co.

John Hampton Barnes, of Philadelphia, Pa., and Silas W. Howland,
of New York City, for Girard Trust Co.

E. V. B. Getty, of New York City, for G. B. Markle Co.

F. W. Wheaton, of Wilkes-Barre, Pa., for Lehigh Valley Coal Co.
and Coxe Bros. & Co., Inc.

HOUGH, District Judge. This suit is but one chapter in a litiga-
tion against anthracite coal owners and carriers, which has now extend-
ed over many years, and become historic. The earliest chapter re-
quiring notice is the "First Commodities Case" (United States v.
Delaware & Hudson Co. et al. [C. C.] 164 Fed. 215, on appeal 213 U.
S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836); next came the "Second Com-
modities Case" (United States v. Lehigh Valley Railroad Co., 220 U.
S. 257, 31 Sup. Ct. 387, 55 L Ed. 458); and finally the Lackawanna
Coal Sales Case (United States v. Delaware, Lackawanna & Western
Ry. [D. C.] 213 Fed. 240). At page 249 of 213 Fed., it is said:

"We understand that (a new action against the Lehigh Railroad) has re-
cently been brought in the Second Circuit"—this is the cause referred to.

The District Court is but a parade ground wherein a review of the
evidence and arguments may be taken before this action joins the

Lackawanna Coal Sales Case on the docket of the Supreme Court. Therefore the statement of facts and summary of litigated questions will be largely made merely by reference to the reports above enumerated.

In the Lackawanna Case (D. C.) 213 Fed. at 263, it is said:

"The bill of complaint also makes a formal charge * * * under the anti-trust act; * * * but the oral argument left us under the impression that this charge was not much insisted on."

This statement of McPherson, J., marks the only substantial difference that I can discover between this litigation and the one in which he wrote.

The bill herein charges violations both of the "Sherman Act" and the "Commodities Clause," but the extended arguments are addressed almost wholly to the anti-trust feature of the litigation. So far therefore as the commodities clause is concerned, I shall dismiss it with the statement that there is no great difference between what the Lackawanna Railway did and was upheld in doing by all the Circuit Judges of the Third Circuit, and what the Lehigh Valley Railroad has been doing as shown in this case.

If there be any material differences, they tend to strengthen the position of the Lehigh as compared with that of the Lackawanna, for the Lackawanna owned outright much, if not most, of the coal long transported over its own lines; whereas, the Lehigh Valley owned the stock of other corporations which under the laws of Pennsylvania had good right to own the lands and mine and sell the coal the transportation of which has given rise to so much litigation. I do not myself think that this difference is substantial. Without further discussion, it is held that nothing in the bill charged constitutes a violation of the "Commodities Clause," if the decision in the Lackawanna Coal Sales Case is right—and that I am not concerned to question.

While the tone of complainant's argument on the "Commodities Clause" is well illustrated by an italicized assertion in the brief that "the court (in the Lackawanna Case) wholly ignored the most vital provisions in the whole contract," and the decision (of three Circuit Judges) is merely that "of a court of co-ordinate jurisdiction and in a different circuit, (and) of course in no way binding upon this court," it is not overlooked that an endeavor has been made to distinguish the Lackawanna suit from this action.

It is asserted that the coal sales company has received and is receiving "discriminating favors from the" other principal defendants. This means that the sales company has an annually diminishing allowance made it by the coal company to encourage the introduction of Lehigh coal in regions where business is presently unprofitable, and has been permitted to buy coal in storage at very low rates; while the railroad company has at inadequate rentals leased to the coal sales company certain "storage plants."

From the assertion that these arrangements are undue favors is drawn the inference that there is a lack of good faith in the creation of the coal sales company which shows that that corporation is but the

alter ego of the coal company, which itself is but the creature of the railroad company; wherefore the law is still infringed.

The suggestion or argument, when examined, amounts to this: That when, by the creation of coal sales companies of which no share of stock belonged to the Lackawanna or Lehigh Railroads, those corporations sought to comply with modern law, it was their duty severally to have no relation whatever with the new companies, except to collect freight charges. But the Lehigh Valley Railroad owned certain lands useful only for storing coal, the coal company had certain coal on hand, and the plan of an independent sales company was new. What should or could be done with the lands and coal on hand, and how could the concern retiring from the selling business insure the creation of a strong and pushing successor? Certainly not by hostility. Who would or could buy the coal on hand and occupy and use the storage plants except the coal sales company? But (says complainant) the prices were ridiculously low. Answer is justified that: (1) The assertion is untrue, and (2) it was praiseworthy and lawful at first to sacrifice much in price when the object was to save from further assault the business of selling coal after interstate transportation—a business that had become precarious owing to modern economics as asserted in statutes and interpreted by the courts.

The differences suggested between this and the Lackawanna Case seem to me wholly unsubstantial.

Upon the anti-trust side of this case no extended discussion of facts is necessary. There is little conflict about facts—in the sense of visible phenomena.

But some analysis of the bill may assist in presenting the theory upon which this suit has been promoted. It is asserted that substantially all of the defendants (except the Girard Trust Company and the G. B. Markle Company)[1] have combined to restrain and monopolize, and have been monopolizing, "the production, transportation and sale in interstate commerce of anthracite coal from lands located along the lines of the Lehigh Valley Railroad."

The method of monopoly and restraint is said to have been by "acquiring control of the output of independent producers by exerting the power of the Lehigh Valley Railroad as a carrier to give undue preference and advantages to the coal producing and trading companies controlled by it and to discriminate against their competitors."

The result of this process is said to be that the "monopoly of the ownership and production of anthracite coal, exercised through subsidiary corporations under its control," has enabled the Lehigh Valley Railroad to prevent "the building of any new railroad in the portion of the anthracite regions served by it, and has kept independent pro-

---

[1] NOTE.—The Girard Trust Company is a defendant solely because it is the trustee of certain bonds which might be injuriously affected by granting the prayers of the bill, and the Markle Company is a party because it long ago made an agreement for a term of years by which the Lehigh Railroad exclusively transports the Markle coal, and the Lehigh Coal Company (and now the coal sales company) became the exclusive selling agent for said coal at prices fixed by Markle.

ducers under the disadvantage of having to ship over a railroad *also engaged in the coal business.*"

The italicized portion of the last sentence is most important, for what is meant by "engagement in the coal business"? The bill, the kind of evidence offered and the arguments in support, all really assume that by "coal business" is meant the operations, united in interest and centralized in control, of mining, shipping, transporting, and selling anthracite coal.

It has already appeared that, if the Lackawanna Coal Sales Case is to be followed, it must be held that the Lehigh Valley Railroad has not since the filing of this bill, or for some time before, been engaged at all in the selling of coal to the consumer. It must therefore follow that, when the government still insists upon the existence of monopoly and restraint of trade, such offensive conduct must be found in an identity of interests between a coal-carrying corporation and coal-owning and mining companies.

But it must also be remembered that the mere fact of such union in interests as manifested by a stock ownership is not unlawful, provided there is a "dissociation in good faith," between "bona fide corporations."

On this point counsel for the government have submitted the proposition that the phrases "dissociation in good faith" and "bona fide corporations," as used in the opinions of the Supreme Court, do not refer merely or chiefly to the honesty or morality of the transactions, so that when they deny "dissociation in good faith" no reflection is thereby made upon the integrity of those concerned in the transaction.

In other words, a body of men may be honest, moral, well-intentioned, and acting within the letter of the law, and yet be unable to resist conviction of monopoly and restraint of trade because they cannot, in "good faith," "dissociate" the corporations which they control. The proposition is incredible; to my mind "dissociation in good faith" requires no more than the lawful conduct of honest men.

Many hundreds of pages of the testimony herein is summed up in the "First Commodities Case" (C. C.) 164 Fed. Rep. at 222. What Gray, J., there stated is still true, and no more detailed reference will be made to the history and development of the Lehigh Valley Railroad and its controlled companies. In order to show monopoly and restraint evidence has been adduced to prove that:

(1) For many years before 1912 the coal mining and selling business of the Lehigh Valley Coal Company was either absolutely unprofitable or would not have been profitable if that corporation had not been secretly, unduly, and unlawfully favored in the matter of freight rates.

(2) Such favors took the form of the railroad company's furnishing at low rates terminal and storage facilities and making advances of money either without interest or at rates far below what was reasonable under the circumstances.

(3) Producers and shippers of coal from lands neither owned nor controlled by any defendant corporation complained of such dis-

criminatory treatment and proved before the Interstate Commerce Commission that their grievances were well founded.

(4) The Lehigh Valley Railroad was one of the defendants in United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, and has therefore been conclusively shown as a conspirator striving to prevent the construction of another railroad which might afford an outlet for anthracite in addition to the lines of the defendants in that suit.

As to all of the above contentions I decline to make any definite finding, because I regard the evidence as immaterial to existing conditions. All of the matters referred to took place before the creation and entry into business of the Lehigh Valley Coal Sales Company, and, assuming all the allegations to be true, it is thought that even in an action under the Sherman Act an opportunity might well be afforded (as in criminal proceedings) for a locus pœnitentiæ.

The following propositions of law I regard as applicable to this case and the enumerated statements of fact as material to the judgment to be pronounced:

(1) Ever since the Lehigh Valley Railroad emerged (more than half a century ago) from the throes of establishing any business at all, it has sought to acquire control (mostly through the Lehigh Valley Coal Company) of a considerable portion of that limited region in the state of Pennsylvania, which so far as is known contains substantially all the anthracite coal in the world.

(2) Either by outright purchase, or by acquisition of the stock of (especially) Coxe Bros. & Co., this process had so far succeeded that in the year 1912 (and just before the formation of the Lehigh Valley Coal Sales Company) the Lehigh Valley Coal Company owned or controlled rather less than 13 per cent. of the nearly contiguous mining regions in Pennsylvania known as the Wyoming, Lehigh, and Schuylkill. That acreage represented a little less than 27 per cent. of the coal lands naturally and conveniently tributary to the lines of the railroad company. Of all anthracite coal transported by all carriers, the Lehigh Railroad was then carrying about 18 per cent., and of that percentage approximately four-fifths came from mines owned or controlled by the Lehigh Valley Coal Company or was produced through such exclusive transportation contracts as had been made with the Markle Company.

(3) The Lehigh Valley Coal Company has from its creation done as it was ordered to do by the Lehigh Valley Railroad, and under such direction has bought, leased, or otherwise acquired control of coal lands. The purpose of this acquisition on the part of the Lehigh Valley Railroad was to get and firmly keep the business of carrying the coal extracted from those lands.

(4) The Lehigh Valley Railroad Company does not now, and has not since March 1, 1912, owned any shares in any company selling coal beyond the limits of Pennsylvania. It does own, and for many years has owned, all the shares of companies which now own and mine coal and sell it in Pennsylvania f. o. b. pit mouth. The same companies before March 1, 1912, sold the coal so mined in many

states of the Union after transportation of the same by the Lehigh Valley Railroad Company.

(5) Since March 1, 1912, the Lehigh Valley Railroad Company has transported no coal (not necessary for its own operation) wherein it had any interest direct or indirect within the meaning of existing statutes.

(6) The allegations of the bill of complaint permitted as an amendment by the Second Commodities Case were fully denied and have never been proved; but, if they were true prior to March 1, 1912, they are now immaterial.

(7) At the time this bill was filed, the regulation of freight rates (including joint rates) for interstate transportation was and still is committed to the Interstate Commerce Commission. No charge of violation of law in respect of rates existing when bill filed or arising since has been proven.

(8) The charge in the bill that freight rates for coal carried were made unreasonably high for the purpose "of injuring independent producers of anthracite," and of forcing them either to sell their mines * * * or enter into contracts for the sale of their output," is not proven; nor is there any such allegation as to existing freight rates or rates existing at the time of bill filed.

(9) The mere creation, maintenance, and extension of the composite business of owning, mining, transporting, and selling coal has long been not only legal but laudable within the state of Pennsylvania— and is so still.[2]

(10) Equitable decrees have occasionally been used as epitaphs or means of preventing the resurrection of obnoxious practices (United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007); but they normally speak in the present tense and are applied to remedy existing evils and not to characterize or condemn past wrongs.

Assuming for argument's sake the correctness of the foregoing, upon what foundation does the complainant's case rest?

The theory is compendiously shown by the following extract from the brief submitted:

### "Carrier Analogous to a Judge.

"The truth is, where a common carrier, charged with the semijudicial duty of holding the scales even between various shippers who compete with one another, and of rendering impartial service to all alike, proceeds to buy up the business of some of these competing shippers, the case is as if a judge upon the bench should proceed to buy up the claims of some of the litigants in his court. The one practice restrains trade and fosters monopoly as much as the other would hinder justice and promote corruption."

This delightful argumentum ad judicem shows that what is really complained of is the bald fact that the railroad company, by owning the stock of various coal companies, controls and practically owns so much anthracite coal that it cannot be trusted to deal fairly with the rest of the world in the matter of transportation charges, which matter

[2] Note.—This proposition is rested without further discussion on the statement of Gray, J., in (C. C.) 164 Fed. 224, as quoted in 213 U. S. 402, 29 Sup. Ct. 527, 53 L. Ed. 836. It might have been made after an examination of the testimony in this case.

the judicial branch of our government is not content to leave to the regulation of another governmental agency, viz., the Interstate Commerce Commission.

It cannot be charged, and is not asserted in argument, that monopoly exists because of the control of so small a portion of anthracite acreage as has been stated above; nor yet in the mere fact of transporting a correspondingly small proportion of all the coal carried by all carriers. So there is found, in the very large proportion which the coal from the Lehigh lands bears to all the coal carried by the Lehigh Railroad, a monopoly within the "territorial unit" consisting of the lands presently reached by the Lehigh Railroad.

This doctrine of territorial unit is a novelty which I do not think bears investigating, for all that it does or can amount to is this (under existing decisions): The coal lands are lawfully owned; the coal therefrom is lawfully carried; there is an actual and honest dissociation of interests between coal owner and coal carrier. The relations which are complained of have therefore no influence upon interstate commerce; for said relations begin, exist, and end within the limits of the state of Pennsylvania, and are there entirely legal.

The foregoing discussion of the "anti-trust" portion of this bill has resulted rather from the vigorous confidence of counsel than from any perception on my part of its difficulty .

If the Lackawanna Case is to be followed, and any violation (at or since time when bill filed) of the commodities clause denied, there is no life left in this action, unless the meaning of the well-worn phrase "interstate commerce" is to receive fresh enlargement. Complainant's evidence and arguments consist largely in an iteration of alleged wrongs committed in those far-off days when the same entity could mine, transport, and sell its own coal without encountering governmental interference. So great were those wrongs, it is said, that, even though transportation and ownership be now fully divorced in "good faith," their recurrence can only be effectually prevented by finding monopoly and restraint in any ownership by a carrier of potential tonnage—which is undoubtedly the railroad way of regarding unmined coal.

But it is still true that to violate the Sherman Act there must be monopoly or restraint of a particular thing—"interstate commerce." Separated from the commodities clause, the same kind of argument would apply to wheat or timber grown on the extensive realty of one of the "land-grant" railroads of the West, and there is at bottom no difference between this argument against the Lehigh Railroad's retention of its coal stocks, and the view humorously condemned by Justice Brewer in an address well worth remembering.[3]

[3] Note.—"The Constitution gives to Congress the exclusive regulation of commerce between the states, as well as between this country and foreign nations; but who can now say, in view of legislation and judicial decision, at what period of time interstate commerce begins, and where it ends? If we listen to the contentions of some we shall be led to believe that when the farmer sows his wheat, having in view the gathering in the fall of a crop of grain which he intends to sell to a mill in some other state, the power of Congress attaches as upon a beginning of interstate commerce and continues until the wheat has been manufactured into bread and eaten by the consumer." Address before Virginia State Bar Association August, 1906.

This case may be thus summed up: No monopoly of interstate commerce is shown, nor any attempt to monopolize; for the proof of the· pudding is in the eating thereof, and it is impossible to find any of the normal·results of monopoly without also finding violations of the commodities clause—and none is discovered. As to restraint of interstate trade in coal transported over the Lehigh Road, there can be no restraint without control, and, since the railroad does not control the coal it carries, it has no means of restraint.

Bill dismissed.