UNITED STATES of America,
Plaintiff,

v.

**BROWN & SHARPE MANUFACTUR-
ING COMPANY,** Defendant.

Civ. A. No. 1367.

United States District Court
D. Rhode Island.

April 2, 1956.

Joseph Mainelli, U. S. Atty., Samuel S. Tanzi, Asst. U. S. Atty., Providence, R. I., for plaintiff.

Marshall Swan, Frank H. Swan, Jr. (of Swan, Keeney & Smith), Providence, R. I., for defendant.

DAY, District Judge.

In this action the plaintiff seeks to recover multiple damages against the defendant because of alleged overcharges of $6,855 by the defendant in the sale by it in May, 1951 of seven automatic screw machines and attachments at prices in excess of the permissible ceiling prices as established by the General Ceiling Price Regulation, 16 F.R. 808, issued January 26, 1951, pursuant to the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix § 2061 et seq. Jurisdiction of this Court to hear and determine this controversy is based upon the provisions of section 706(b) of said Act and of 28 U.S.C.A. § 1345.

The complaint in this action was filed on May 10, 1952. The allegations of the complaint may be summarized as follows: that the defendant Brown & Sharpe Manufacturing Company, a Rhode Island corporation, was at the time of the filing of the complaint and during the period covered therein engaged in the manufacture of machinery in the City of Providence; that the Director of Price Stabilization, pursuant to the Defense Production Act of 1950, as amended, Executive Order No. 10161, 50 U.S.C.A.Appendix, § 2071 note and in accordance with Economic Stabilization Agency General Order No. 2 issued General Ceiling Price Regulation, 16 F. R. 808, effective January 26, 1951; that defendant, both prior to and after January 26, 1951, sold and delivered machinery for sales of which said Regulation established ceiling prices, and that the defendant in its sales of such machinery was subject to the provisions of said Regulation; that the Regulation prohibited the sale of any commodity at a price in excess of the ceiling price established by the Regulation; that the defendant has sold and delivered machinery at prices in excess of the ceiling prices as set forth more particularly in "Exhibit A" attached to and made a part of the complaint, on which Exhibit it is stated that the purchaser of the machinery was American Aircraft Mfg. Co., the dates of the sales as May 11, 1951, and May 18, 1951 and the overcharges as being $6,855; and that thirty days had elapsed since the dates of sales without any action for damages having been instituted by the purchaser of said machinery. The plaintiff seeks judgment for three times the amount of said alleged overcharges together with reasonable attorneys' fees and costs.

In its answer the defendant denies that this Court has jurisdiction to hear and determine this action, denies that it has sold and delivered machinery for which the General Ceiling Price Regulation established ceiling prices and specifically that it sold the machines and attachments described in said "Exhibit A" to the purchaser named therein and asserts that the complaint fails to state a claim against it upon which relief can be granted.

However, the defendant has apparently waived its contention as to want of jurisdiction in this Court and the parties have submitted the matter for determination on a stipulation of agreed facts. Summarized, the parties have agreed that the material facts are the following: The price regulation applicable to the transactions of which plaintiff complains was General Ceiling Price Regulation, 16 F.R. 808, effective January 26, 1951; as issued, Section 3 thereof provided in substance that defendant's ceiling price was established at the highest price at which defendant delivered the commodity to a purchaser of the same class during the base period of December 19, 1950, to January 25, 1951, or if it did not deliver the commodity then the highest price at which it offered the commodity for base period delivery to a purchaser of the same class; Section 22 of the Regulation which defines "purchaser of the same class" reads as follows:

*"Class of purchaser or purchaser of the same class.* This term refers to the practice adopted by a seller in setting different prices for sales to different purchasers or kinds of purchasers (for example, manufacturer, wholesaler, shopper, retailer, Government agency, public institutions or individual consumer) or for purchasers located in different areas or for purchasers of different quantities or grades or under different terms or conditions of sale or delivery."

during said base period, to-wit, between December 19, 1950 and January 25, 1951, the defendant shipped or delivered 36 machines and attachments of the type involved in this action (exclusive of orders obtained by Brown & Sharpe Company), two of which deliveries involved a government priority; the highest prices at which these machines were delivered during said base period to any customer were the prices appearing on the defend-

ant's "White Price Pages" to which I shall hereinafter refer; during said base period the defendant did not ship or deliver any machines and attachments of the type involved herein to any purchaser whose orders were originally scheduled for 1952 delivery and delivery of which was advanced to 1951 by reason of a government priority; prior to January 26, 1951, the defendant issued two price lists, one for machines and attachments scheduled for delivery in 1951, known as "White Price Pages", and carrying lower prices, and the other for the same type of machines and attachments scheduled for shipment on and after January 1, 1952, known as "Blue Price Pages" and carrying higher prices; neither of these "Price Pages" indicated the price which would apply in the event an order was accompanied by a Government priority; that on March 19, 1951, the Director of Price Stabilization amended the definition of the word "sell" in Section 22 of the Regulation in order that the taking of orders for future delivery would not be impeded and sellers were by this amendment permitted to contract to sell for future delivery at a price not in excess of the ceiling price in effect at the time of delivery; on January 24, 1951, Brown & Sharpe of New York, Inc., a wholly owned subsidiary of the defendant, received in New York from American Aircraft Mfg. Co., Ltd., a written purchase order for the seven machines and attachments which are involved in this action, and on the same day Brown & Sharpe of New York, Inc., orally quoted the prices listed therefor in the "Blue Price Pages" for shipment in January 1952; by letter dated the same day it confirmed the prices orally quoted; on January 26, 1951, American Aircraft Mfg. Co., Ltd., wrote to Brown & Sharpe of New York, Inc., enclosing a priority order of Department of Navy requesting delivery not later than February 15, 1951; by letter dated February 12, 1951, the Providence, Rhode Island, office of Brown & Sharpe of New York, Inc., acknowledged receipt of this priority rating and advised American Aircraft Mfg. Co., Ltd.,

that "Pending clarification of price regulations issued by the Office of Price Stabilization we are not in a position to make formal acceptance of your order at this time."; later, on April 13, 1951, the defendant submitted to American Aircraft Mfg. Co., Ltd., a pro-forma invoice covering the latter's purchase order for said seven machines and attachments, and under date of April 18, 1951, American Aircraft Mfg. Co., Ltd., requested that the machines and attachments be invoiced to S. C. Schefrin & Co. which supplied the funds for their purchase and that they be shipped to the premises of the former; on May 9, 1951, S. C. Schefrin & Co. delivered its certified check for $44,398.50 payable to Brown & Sharpe of New York, Inc., in payment for six of said machines and attachments which were shipped on May 11, 1951, to American Aircraft Mfg. Co., Ltd., although invoiced by Brown & Sharpe of New York, Inc., on the same date to S. C. Schefrin & Co.; this invoice bore the following notation: "Pending clarification of existing regulations of the Office of Price Stabilization permitting us to establish definitive ceiling prices, we are submitting this memorandum invoice and request that you remit the amount shown hereon. Should such ceiling prices, when established, be lower than the memorandum charges contained herein, we will promptly refund the difference to you"; on May 17, 1951, S. C. Schefrin & Co. forwarded its certified check of $9,111 payable to Brown & Sharpe of New York, Inc., in payment of the price of the seventh machine and attachments; this machine and attachments were invoiced in the same manner and shipped to the same destination as were the other six machines and attachments.

The parties have also stipulated that on October 11, 1951, the defendant applied to the Office of Price Stabilization on O. P. S. Form 8 for an increase in the ceiling prices for machines and attachments of the type involved here from $46,654.50 (White Price Pages) to $53,509.50 (Blue Price Pages), the amount actually paid to Brown & Sharpe of New

York, Inc., by S. C. Schefrin & Co. under its arrangement with American Aircraft Mfg. Co., Ltd., and that such increase was not allowed and did not become effective until October 29, 1951.

Plaintiff and defendant have also stipulated as to the following facts, viz.: defendant was, during the period involved in this action, a manufacturer of machine tools, machinists' tools and related machinery shop equipment with its manufacturing plant in Providence, Rhode Island; its products were distributed through sales offices located throughout the United States; it maintained sales offices at Hartford and Philadelphia; customers located in the areas of Chicago, Cleveland, Detroit and Los Angeles were serviced by sales offices in those cities of the Brown & Sharpe Company, a wholly owned subsidiary of the defendant; customers in the area of New York City, Rochester and Syracuse were serviced by sales offices in those cities of Brown & Sharpe of New York, Inc., a wholly owned subsidiary of the defendant; in addition, Brown & Sharpe of New York, Inc., had a non-sales office at the defendant's plant in Providence; other areas of the United States were serviced by sales representatives who were not subsidiaries of the defendant; exclusive sales rights were granted in each of the aforesaid territorial areas to the several representatives and all orders from customers in a specific area were handled by the representative for that area; American Aircraft Mfg. Co., Ltd., was within the territorial area of the New York office of Brown & Sharpe of New York, Inc.

The parties have also stipulated that Brown & Sharpe of New York, Inc., is a corporation organized under the laws of the State of New York; that all of its corporate stock was owned by the defendant; that it was engaged exclusively in the business of selling products which the defendant manufactured or bought for resale; that it maintained its own sales organization in New York City, staffed by employees on its own payroll; that it maintained separate bank accounts in its own name in which funds from the sales of products by it were deposited and from which its expenses were paid; that prior to the institution of this action it had been treated as a legal corporate entity by the State of New York and by the United States government tax authority; that it paid a gross receipts tax to the City of New York based on its sales and that its Federal income tax return for the year 1951 was consolidated with that of the defendant's and filed with the Collector of Internal Revenue in Providence.

In 1951 and prior thereto the defendant furnished its price lists, information respecting its production schedules, directives, and like information required by sales representatives to all of its sales representatives whether or not such representatives were wholly owned subsidiaries, partnerships, corporate entities or individual entrepreneurs.

On December 12, 1935, the defendant and Brown & Sharpe of New York, Inc., entered into a written agreement which was in full force and effect at the time involved in this action; this agreement provided that the defendant would charge Brown & Sharpe of New York, Inc., monthly for sales at 12½% off the invoice price to customers or branch stock; and that the defendant would make a provisional monthly charge of 4% of sales for services rendered by it in behalf of Brown & Sharpe of New York, Inc., such as keeping books and records, attending to credits and correspondence, supervision and promotion; this agreement also provided that inasmuch as the volume of sales and expense of performing these services would necessarily vary the monthly charge of 4% would be provisional and adjustments would be made at the end of each year or oftener so that the defendant would be fairly compensated in each year for all services rendered in behalf of Brown & Sharpe of New York, Inc.

The defendant's accounting method for recording amounts payable by Brown & Sharpe of New York, Inc., on orders for-

warded by any of its offices and filled by the shipments of the products covered thereby from the defendant's plant directly to the purchasers thereof was to tabulate monthly the total amount of the invoices rendered by Brown & Sharpe of New York, Inc., and to deduct therefrom 12½% thereof; the total so obtained was then placed monthly on an accounts receivable card maintained by the defendant and on an accounts payable card of Brown & Sharpe of New York, Inc.

During the period involved in this action the sole business activities of Brown & Sharpe of New York, Inc., were to advance the sale of defendant's products in accordance with defendant's announced sales policies and directives, and it operated at a profit in 1951; none of the products sold by it were forwarded to it by the defendant for trans-shipment and it did not maintain any inventory (other than samples for display) and maintained no warehouse; and it made sales of defendant's products at prices established by the defendant on such delivery terms and shipping dates as the defendant determined.

On December 13, 1950, the defendant mailed a copy of its "Blue Price Pages" and an instruction letter to all its shops and offices, salesmen and domestic and Canadian agents, including at least two independent dealers (not subsidiaries of defendant) in machinery and tools which solicited orders for machines and tools manufactured by the defendant and purchased them from the defendant at a discount of 12½%; the instruction letter instructed the person to whom it was sent that the prices set forth in the "Blue Price Pages" must be used in quoting the prices for any machines to be delivered after January 1, 1952; that prices listed in the "White Price Pages" would continue in use until further notice for machines scheduled for shipment before January 1, 1952; that when an order is accepted on the basis of shipment on and after January 1, 1952, but ship-

ment is made before then, the lower price will prevail unless the date of delivery is advanced "on account of exchange with another customer due to U. S. Government priority rating"; and "where machines of two customers are interchanged on account of priority rating each will be billed at the price at which his order was originally entered and accepted." In addition, this letter contained the following direction: "In ascertaining the price to be quoted on machines and attachments we shall establish the shipping date for an order without U. S. Government priority and quote the applicable price, even though the actual shipping date may be advanced by the application of a priority."

After the submission of this matter upon this stipulation as to the facts the parties filed original and reply briefs. Plaintiff reiterates its contentions that the seven machines and attachments shipped to American Aircraft Mfg. Co., Ltd., in May 1951 had a ceiling price of $46,654.50, and that the sale thereof was made by the defendant.

On the other hand, the defendant contends that the ceiling price of these machines and attachments was $53,509.50, the prices listed in the "Blue Price Pages", that such prices were offered during its base period to a class of purchasers different from the class to which the lower prices, listed in the "White Price Pages", would be applicable and that accordingly there was no overcharge on their sales; and further, that said machines and attachments were not sold by it to American Aircraft Mfg. Co., Ltd., but by Brown & Sharpe of New York, Inc., its wholly owned subsidiary which it asserts is a separate and distinct corporation for the acts of which it is not responsible.

The issues to be determined are—(1) what was the ceiling price of the machines and attachments in May 1951, and (2) if they were sold for a price in excess of the ceiling price, was the defendant the seller thereof?

As originally issued sec. 3 of the General Ceiling Price Regulation contained the following language:

"Sec. 3. *Ceiling prices for all sellers for commodities or services sold in base period.*

Your ceiling price for sale of a commodity or service is the highest price at which you delivered it during the base period to a purchaser of the same class. If you did not deliver the commodity or service during the base period, your ceiling price is the highest price at which you offered it for base period delivery to a purchaser of the same class. The offer must have been made in writing, but in the case of a retailer may have been made by display."

However, on February 28, 1951, the last sentence of said section was amended so that it read as follows:

"* * * The offer must have been made in writing and communicated to a substantial number of customers, but in the case of a retailer may have been made by display."

This amendment also added the following provision to sec. 3 immediately following the word "display":

"If you are a manufacturer or a wholesaler, you cannot, unless permitted by paragraph (b) (1) of this section use a price as your ceiling price to a class of purchaser unless you made at least 10% by dollar volume of your total deliveries of the commodity during the base period to that class of purchaser at that price or at a higher price."

And the permission granted by said paragraph (b) (1) was accorded in the following language:

"(b) (1) *General increases to all of a class of purchasers.*

"If, before or during the base period, you announced in writing and put into effect a price increase for a class of purchasers by making some deliveries to that class at the higher price and no deliveries at a lower price (except pursuant to written firm commitments made before the price increase) the increased price becomes your ceiling price for that class of purchaser, even though less than 10 per cent of your base period deliveries to that class were made at the higher price."

The defendant contends vigorously that the selling prices listed on the "Blue Price Pages" for delivery in 1952 coupled with its instruction sheet became its ceiling price for machines and attachments when delivery thereof originally scheduled for 1952 was accelerated to 1951 because of a government priority. It claims that a customer who received a delivery under such circumstances was a class of purchaser within the meaning of sec. 3 for whom it had established a higher price during its base period. During its base period, according to the stipulation, it shipped or delivered thirty-six machines of the kind involved here, two of which deliveries involved a government priority. The highest prices at which they were shipped or delivered during the defendant's base period were the prices listed on defendant's "White Price Pages". The defendant concedes that no deliveries were made by it during its base period at prices higher than those listed in its "White Price Pages". It also concedes that no deliveries were made during said base period to a customer whose order was originally scheduled for delivery in 1952 but was filled during the base period because of a government priority giving it precedence over earlier orders.

At this stage of this proceeding I do not deem it necessary for me to pass upon the question of the propriety of the defendant's action in classifying purchasers whose orders originally scheduled for delivery in 1952 were advanced by reason of a government priority for delivery in 1951 as a class of purchaser within the fair meaning of sec. 22 of the General Ceiling Price Regulation.

I think it suffices for me to say that under sec. 3, as amended, it is clear that since the defendant made no delivery to such a class of purchaser during its base period, the increased price shown on its "Blue Price Pages" did not become its ceiling price for deliveries in 1951 to purchasers whose orders were originally scheduled for 1952 and advanced to 1951 because of a priority. Its ceiling prices in the absence of such deliveries during its base period were the prices appearing on its "White Price Pages".

The total ceiling price for the machines and attachments was $46,654.50. Consequently, the price actually paid therefor exceeded the ceiling price by $6,855 as claimed by the plaintiff.

There remains the issue—did the defendant sell them?

The parties have agreed that Brown & Sharpe of New York, Inc., conducted the negotiations leading up to the eventual sale of said machines and attachments; that it invoiced them to S. C. Schefrin Co. which advanced their purchase price to American Aircraft Mfg. Co., Ltd., and that it received the purchase price. However, the plaintiff contends that Brown & Sharpe of New York, Inc., the wholly owned subsidiary of the defendant, although a separate corporation, was merely the instrumentality or alter ego of the defendant.

The mere fact that one corporation owns all of the capital stock of a subsidiary corporation, standing alone, is not enough to warrant the disregard of their separate legal entities or sufficient to establish the subsidiary as the agent of the parent corporation. More is required. But where it is also shown that the business conducted by the subsidiary is a part of the business of the parent corporation, and where such ownership of stock in a subsidiary is employed not for the purpose of participating in the affairs of the subsidiary in a manner normal and usual with stockholders but for the purpose of making it a mere agent or department of the parent corporation, the courts will look through the form to the realities of the relation between the corporations and will hold that in such cases the subsidiary is a mere agent or department for carrying on the business of the parent corporation. United States v. Lehigh Valley R. Co., 220 U. S. 257, 31 S.Ct. 387, 55 L.Ed. 458; Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460; In re Watertown Paper Co., 2 Cir., 169 F. 252.

In the present case the stipulation of the parties establishes the following facts: all of the stock of Brown & Sharpe of New York, Inc., was owned by the defendant; the exclusive business of the subsidiary was the sale of the defendant's products; it carried no inventory; defendant fixed prices and determined dates of shipments which were directly to the purchasers; no charges were ever made by defendant to its subsidiary until the purchaser's order was accepted, filled, and the article was shipped by defendant; the subsidiary's "discount" of 12½% off the invoice price of sales was subject to possible elimination by the power of the defendant to increase its monthly provisional charges of 4% for its "service charges"; and no transfers of title to any of the machines and attachments herein involved or of any others for that matter were made by the defendant to its subsidiary.

The foregoing facts convince me that the subsidiary corporation had no independent business of its own, that it was merely an agent or instrumentality of the defendant's business, that it was organized and employed by the defendant solely for the furtherance of the latter's business purposes and was so regarded by the defendant.

In making this finding I do not mean to indicate or imply that there was any impropriety or improper motives by the defendant in its relations with its subsidiary. There is not the slightest evi-

dence or ground for any inference that defendant's objectives in its holding of the entire capital stock of its subsidiary or in the conduct of its relations with it were to perpetrate a fraud or to commit any wrongful act whatever.

However, notwithstanding my determination in that regard, I find that the defendant was the seller of the machines and attachments herein involved, acting through its agent and instrumentality, Brown & Sharpe of New York, Inc.

In accordance with the agreement of the parties, I have not considered the question of the willfulness of the defendant's violation of the Regulation.

In conclusion, I find that the plaintiff has established by a fair preponderance of the evidence that the defendant sold the seven machines and attachments herein involved for a total price which was $6,855 in excess of the ceiling price therefor established by said Regulation.

The question of whether the defendant's violation was willful or the result of its failure to take practical precautions against the occurrence of the violation will be decided by me after hearing following due notice to the parties.